## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER GRINIS, MICHAEL GORDON, and ANGEL SOLIZ, on behalf of themselves and those similarly situated, <br>     *Petitioners*, <br>         v. <br> STEPHEN SPAULDING, Warden of Federal Medical Center Devens, and MICHAEL CARVAJAL, Director of the Federal Bureau of Prisons, in their official capacities, <br>     *Respondents*. | No.  20-cv-_____ <br><br> Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Complaint for Injunctive and Declaratory Relief <br><br> Class Action <br><br> **IMMEDIATE RELIEF SOUGHT** |

### INTRODUCTION

1.    Camp Devens, a U.S. military installation established during World War I, was not the first place to see an influenza outbreak in 1918, but it was one of the hardest hit; more than 15,000 people were infected, and more than 800 died.[1]



---

[1] Jack Lepiarz, "How Boston Reacted to the 1918 Flu Pandemic," *WBUR* (Mar. 11, 2020), *available at* https://www.wbur.org/commonhealth/2020/03/11/boston-1918-flu-pandemic-coronavirus.

2.      A century later, Devens faces a similar catastrophe. It now hosts a Federal Bureau of Prisons ("BOP") medical center and satellite camp that hold over 1,000 men, including some of America's most elderly, sick, and medically vulnerable prisoners. Those prisoners are acutely at risk of illness and death due to the COVID-19 pandemic, and any outbreak at the prison will imperil not only them, but also BOP staff and the surrounding community. This lawsuit seeks to vindicate the constitutional rights of those imprisoned at Devens and, in so doing, to protect their safety and improve public health.

3.      Respondent Michael Carvajal, who only became BOP Director in February 2020, candidly admitted on April 11: "I don't think anybody was ready for this Covid. . . . It was quite overwhelming, a week or two into this job, knowing that we were going to have to deal with something like this."[2]

4.      Available statistics reveal a public health disaster now erupting across BOP facilities that worsens with each passing day. From March 20 to April 14, confirmed COVID-19 cases among BOP prisoners and staff rose from 2 to 692 across 42 facilities nationwide. Severe outbreaks at FCI Oakdale in Louisiana, FCI Elkton in Ohio, FCI Butner in North Carolina, and FCI Danbury in Connecticut already have resulted in dozens of confirmed COVID-19 infections among prisoners and staff, many more suspected but unconfirmed cases, and multiple prisoner deaths.

---

[2] David Shortell, Kara Scannell, and Manu Raju, "'I don't think anybody was ready for this Covid,' says head of federal prisons," *CNN* (Apr. 11, 2020), *available at* https://www.cnn.com/2020/04/10/politics/exclusive-interview-bop-carjaval/index.html.

5.      That surge of COVID-19 cases inside the federal prison system has dwarfed the national percentage increase in confirmed cases over the same time period:[3]



6.      FMC Devens—one of only 7 federal prison medical centers—is a powder keg of potential infection and death from COVID-19, to an even greater degree than nursing homes, cruise ships, and other prisons, sites of some of the

[3] These statistics and associated charts are based on published CDC and BOP data, compiled and updated daily at https://federaldefendersny.org/.

most intense clusters of mortality in Massachusetts, the United States, and elsewhere in the world.

7.      FMC Devens prisoners—many of whom are elderly, medically vulnerable, or both—are at uniquely high risk of infection, serious illness, and death.

8.      FMC Devens is the only federal prison to operate a Memory Disorder Unit ("MDU"), a nursing home for prisoners who suffer from dementia, cannot care for themselves, and require regular nursing care. In the MDU, healthier prisoners serve as "companions," who assist disabled prisoners with activities of daily living, including bathing, shaving, dressing, and toileting.[4]

9.      Although there have been no confirmed COVID-19 cases at FMC Devens as of April 14, Respondent Warden Spaulding recently acknowledged to prisoners and staff that it is not question of "if" confirmed cases will appear among prisoners and staff, but "when."

10.     FMC Devens prisoners, therefore, face maximum danger from COVID-19, require the most urgent judicial intervention, and are the most appropriate candidates for compassionate release and/or immediate transfer to home confinement. This is true of both the elderly and medically vulnerable prisoners in the medical center and the mostly low-level, non-violent offenders, serving short sentences or otherwise nearing their release dates, in the satellite camp.

---

[4] *See* https://www.nccdp.org/resources/caring-for-inmates-in-a-specialized-dementia-unit-in-a-correctional-setting.pdf; https://alanellis.com/bop-health-care-what-you-and-your-clients-need-to-know/.

11.    At current facility population levels, prisoners at FMC Devens cannot comply with the Centers for Disease Control and Prevention ("CDC") guidelines for physical distancing, a "cornerstone" of risk reduction in prisons.[5]

12.    Respondents, Director Carvajal and Warden Spaulding, have demonstrated deliberate indifference to the severe and obvious risk of rampant infection and death that COVID-19 poses to FMC Devens prisoners, in violation of the U.S. Constitution's Eighth Amendment prohibition against cruel and unusual punishment.

13.    Respondents have failed to provide prisoners the ability to physically distance by ordering compassionate release and/or implementing immediate transfers to home confinement with sufficient speed or in sufficient numbers; indeed, they have prevented, and continue to prevent, prisoners from protecting themselves from infection by requiring prisoners to live, sleep, eat, congregate, recreate, and engage in other activities in crowded conditions that make effective social distancing impossible.

---

[5] *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), at 4 ("Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19"); *id.* ("Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic."), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

14.     So long as prisoners are unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections at FMC Devens.

15.     As in 1918, Devens in 2020 is not among the first locations to experience confirmed infections, but it could again quickly become one of the hardest hit. Without urgent intervention by this Court, another outbreak of illness and death threatens to engulf the facility, with devastating consequences not only for Petitioners and other vulnerable prisoners, but also for correctional staff, local health care workers, their families, and the broader community.

16.     Calling for immediate and extensive "efforts to decarcerate" to protect both prisoners and the general public, the *New England Journal of Medicine* explained:

> The boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel. Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries.  We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. . . .
>
> To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.[6]

17.     FMC Devens urgently requires these efforts.

---

[6] Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D., "Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons," *New England Journal of Medicine* (Apr. 9, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

## JURISDICTION AND VENUE

18.     Petitioners bring this putative class action pursuant to 28 U.S.C.

§ 2241 for relief from their detention, which violates the Eighth Amendment to the

U.S. Constitution.

19.     This Court has subject matter jurisdiction over these constitutional

claims pursuant to 28 U.S.C. § 2241 (habeas corpus); 28 U.S.C. § 1651 (All Writs

Act); Article I, § 1, clause 2 of the U.S. Constitution (Suspension Clause); and 28

U.S.C. § 1331 (federal question).

20.     This Court also jurisdiction over claims for declaratory and injunctive

relief pursuant to 28 U.S.C. § 2201-02 and based on its inherent equitable powers.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C.

§ 2241(d), because Petitioners and Class Members are in custody in this district,

and pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the events or

omissions giving rise to Petitioners' claims occurred in this district.

## PARTIES

22.     Petitioner Alexander Grinis, BOP Register No. 01014-138, is

imprisoned in the minimum-security satellite camp at FMC Devens. Grinis, who is

49-years old and has a medical history of hypertension and atypical chest pain, is at

high risk not only of contracting COVID-19, but of having a severe case that leads to

serious illness or death. Grinis is an appropriate candidate for compassionate

release and/or immediate transfer to home confinement. He is serving a 9-month

sentence based on a conviction for making a false statement on a loan application,

and the BOP has calculated his release date to be June 16, 2020. The BOP has

advised Grinis that he will be released to a halfway house on or about May 21, 2020 and that he will be required to spend 14 days in solitary confinement in the Special Housing Unit ("SHU") of the prison, more commonly a severe punitive sanction, as a form of quarantine prior to his release to the halfway house. On April 10, Grinis sent a request by U.S. Mail to Warden Spaulding for compassionate release or, in the alternative, immediate transfer to home confinement. As of this filing, Grinis has received no response.

23.    Petitioner Michael Gordon, BOP Register No. 96426-038, is imprisoned in the "H-B" unit of the administrative security medical center at FMC Devens. Gordon, who 51-years old, underwent a liver transplant, and is on immunosuppressant medications to keep his body from rejecting the liver. In addition, he suffers from hypertension and has experienced a pulmonary embolism and deep vein thrombosis. Because of these conditions, he is at high risk not only of contracting COVID-19, but of having a severe case that leads to serious illness or death. Gordon is an appropriate candidate for compassionate release and/or immediate transfer to home confinement. He is serving a 180-month sentence based on convictions for conspiracy to distribute marijuana, conspiracy to launder money, and money laundering. The BOP has calculated his release date to be August 18, 2027. On April 10, Gordon submitted a request to Warden Spaulding for compassionate release or, in the alternative, transfer to home confinement. As of this filing, Gordon has received no response.

24.     Petitioner Angel Soliz, BOP Register No. 70926-079, is imprisoned in the "J-B" unit of the Medical Center. Soliz, who is 59-years old, requires dialysis, has had a triple bypass, and is diabetic. Because of those conditions, Soliz is at high risk not only of contracting COVID-19, but of having a severe case that leads to serious illness or death. Soliz is an appropriate candidate for compassionate release and/or immediate transfer to home confinement. He is serving a 240-month sentence for conspiracy and possession with intent to distribute methamphetamine. The BOP has calculated his release date to be September 13, 2033. Soliz submitted a request Warden Spaulding for compassionate release, which was denied. He pursued administrative remedies, which were also denied.

25.     Respondent Stephen Spaulding is the Warden of FMC Devens and, in that official capacity, has immediate custody of Petitioners and all proposed Class Members.

26.     Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons and, in that official capacity, is responsible for the safety and security of all persons, including Petitioners and all proposed Class Members, serving federal sentences at BOP facilities, including FMC Devens.

## FACTUAL ALLEGATIONS

**The COVID-19 pandemic endangers everyone, especially prisoners who cannot physically distance or maintain personal hygiene.**

27.     COVID-19 is the potentially deadly disease caused by a novel coronavirus that has sparked a global pandemic.

28.     The CDC has reported that, as of April 14, 2020, there were 579,005 confirmed cases of COVID-19 in the U.S. and 22,252 people have already died.[7]

29.     The Massachusetts Department of Public Health ("DPH") has reported that, as of April 14, 2020, in Massachusetts, there were 28,163 confirmed cases and 957 deaths attributed to COVID-19.[8]

30.     The novel coronavirus that causes COVID-19 is highly contagious. It spreads from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days. Critically, people who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread.

31.     COVID-19 is potentially fatal. According to estimates from the CDC and the World Health Organization, the mortality rate among confirmed cases of COVID-19 is significantly higher—possibly, 10 to 30 times higher—than from severe seasonal influenza.

---

[7] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[8] *See* https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring.

32.     Although all people, regardless of their age or health, are at risk of serious illness and death from COVID-19, the CDC has identified certain categories of people who face especially high risks.

33.     According to the CDC, people who are 65-years old or older face higher risks. If infected, these older adults are more likely to require hospitalization, to be admitted to intensive care units, and to die.[9]

34.     According to the CDC, people of all ages similarly face higher risks if they have underlying medical conditions, including chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease undergoing dialysis, liver disease, or compromised immune systems as a result of cancer treatment, organ or bone marrow transplants, prolonged use of corticosteroids, HIV, a history of smoking, or other immune deficiencies.[10]

35.     In addition, the CDC has identified prisons, along with nursing homes, long-term care facilities, group homes, and cruise ships, as environments that are especially susceptible to rapid outbreaks of infection due to close person-to-person contact among large, confined populations.[11]

---

[9] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[10] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[11] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

36.     Even people who survive COVID-19 often suffer excruciating pain from infection; severe damage to lung tissue, including a permanent loss of respiratory capacity; and damage to other vital organs, such as the heart and liver.

37.     Serious complications from COVID-19 can develop rapidly. Some patients show the first symptoms of infection within two days of exposure, and their conditions can seriously deteriorate in less than five days.

38.     Most people in high-risk categories who develop serious illness require advanced medical support, including specialized equipment, such as ventilators, and large teams of highly trained care providers, such as ICU doctors, nurses, and respiratory therapists. The artificial ventilation process is itself invasive and dangerous, and some patients must be placed in medically induced comas for such treatment.

39.     Given the need for advanced and urgent intervention, often in an ICU environment, people with severe cases of COVID-19 cannot be shackled or otherwise restrained, nor can they be subjected to constant, close supervision by correctional staff, as they would be in a typical correctional setting. FMC Devens cannot provide advanced support in an ICU setting with ventilators, certainly not for a substantial group of seriously ill prisoners who may require such specialized care.

40.     There is no vaccine or cure for COVID-19, and there is no widely available therapeutic treatment that has proven safe and effective.

41.     According to CDC guidelines, only two measures are known to be effective in reducing the spread of this disease: (1) diligent "social or physical distancing," which involves keeping at least six feet of space between people to avoid transmission of the virus, and (2) vigilant hygiene practices, including frequently washing hands and regularly disinfecting surfaces. Physical distancing is a necessary predicate for hygiene practices to have any meaningful impact.

42.     Because asymptomatic or pre-symptomatic people can transmit the virus to others, it is critical to follow CDC guidelines, including social distancing, even among people who show no signs of COVID-19 and appear to be healthy.

43.     These measures are not possible in prisons, like FMC Devens, without substantial reductions in the prisoner population. Even "modified lockdowns" cannot establish effective social distancing, given the way in which prisoners sleep, eat, congregate, recreate, and receive medical treatment; nor do such correctional measures ensure the implementation of necessary hygiene practices, particularly when adequate supplies of free soap, sanitizers, disinfectants, and paper towels are not available.

44.     At all times, prisoners and staff interact in close proximity under cramped conditions that are designed to confine people rather than distance them; as a result, correctional facilities are highly susceptible to rapid transmission of the virus through contact with other persons, including asymptomatic carriers who show no signs of illness, and common surfaces.

45.     Moreover, prisoners, correctional staff, and contractors regularly move in and out of correctional facilities, and such movement creates an ever-present risk that persons, including asymptomatic carriers, will carry the virus into and out of those facilities, spreading infection and triggering outbreaks.

46.     The recent deadly outbreaks in the Cook County Jail in Chicago, and at the Rikers Island Jail in New York, where the transmission rate for COVID-19 is estimated to be the highest in the world, demonstrate the terrible dangers that prisons pose to public health, inside and outside the walls, during this pandemic.[12]

47.     The only effective way to minimize the potential devastation from COVID-19 at FMC Devens is to downsize immediately the incarcerated population and, for the prisoners who remain at the institution, to undertake aggressively the detection, prevention, and treatment measures that public health and medical experts have recommended, including effective social distancing.

48.     In a March 26, 2020, memorandum to Respondent Carvajal, Attorney General William Barr identified home confinement as "[o]ne of the BOP's tools to manage the prison population and keep inmates safe" from COVID-19.[13]

---

[12] *See* Cheryl Corley, "The COVID-19 Struggle in Chicago's Cook County Jail," *NPR* (Apr. 13, 2020), *available at* https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail; Asher Stockler, "More than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff," *Newsweek* (Apr. 8, 2020), *available at* https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

[13] *Available at* https://www.justice.gov/file/1262731/download.

49.     Attorney General Barr directed Respondent Carvajal "to prioritize the use of [the BOP's] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," because "for some eligible inmates, home confinement might be more effective in protecting their health."

50.     Attorney General Barr further identified "[t]he age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and "the security level of the facility," with "priority given" to prisoners incarcerated "in low and medium security facilities," as two of the critical, discretionary factors for consideration.

51.     In an April 3, 2020, memorandum to Respondent Carvajal, following the dramatic increases in confirmed COVID-19 cases at three BOP facilities (FCI Oakdale in Louisiana, FCI Danbury in Connecticut, and FCI Elkton in Ohio), Attorney General Barr affirmed the BOP's "profound obligation to protect the health and safety of all inmates."[14]

52.     Attorney General Barr further recognized that, despite "extensive precautions to prevent COVID-19 from entering [BOP] facilities and infecting our inmates," those measures "have not been perfectly effective." Accordingly, he ordered the BOP to take more aggressive steps, immediately, to transfer prisoners to home confinement, even if electronic monitoring will be not be available.

---

[14] *Available at* https://www.justice.gov/file/1266661/download.

53.    Echoing the warnings of public health experts, Attorney General Barr stated: "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence."

54.    In spite of Attorney General Barr's statements, Respondents have failed to use the BOP's available statutory authority to reduce the population of FMC Devens with sufficient speed or in sufficient volume to mitigate the severe risk posed by COVID-19.

55.    From March 26 (the date of Attorney General Barr's first memo) through April 13, the BOP states that it has placed 1,019 prisoners nationwide into home confinement (an average of approximately 56 per day), which is just 0.5 percent of the approximately 180,000 prisoners in BOP custody.

56.    The significance of this statistic is further diminished because the BOP has not disclosed the number of prisoners it typically released per day prior to Attorney General Barr's memos, nor has it disclosed how many new prisoners have entered BOP custody during the same time period. In short, data from the BOP demonstrate that it is not releasing enough prisoners to protect federal prisons from COVID-19.

**Individuals detained at FMC Devens, a federal prison hospital and camp facility, face unique dangers of serious disease and death.**

57.    FMC Devens is an administrative security federal medical center ("Medical Center") with an adjacent minimum-security satellite camp ("Camp").

58.    The Medical Center houses nearly 1,000 federal prisoners, many of whom require specialized or long-term medical or mental health treatment. These

prisoners are designated to the Medical Center for many of the same reasons that make them highly vulnerable to serious illness and death from COVID-19. As of April 9, 2020, the BOP reports that 914 prisoners are incarcerated at the Medical Center, which represents 86 percent the Medical Center's maximum capacity of 1066 prisoners.[15]

59.     Prisoners often leave the Medical Center, under the supervision of correctional staff, to see outside healthcare specialists and for tests and medical procedures at facilities in the community, after which they return to the Medical Center.

60.     Prisoners who require dialysis travel from their individual units to the dialysis facility on the Medical Center compound, after which they return to their individual units.

61.     The Camp houses more than 100 federal prisoners, most of whom are non-violent offenders serving relatively short sentences or nearing their release dates. They are designated to the Camp for many of the same reasons that make them appropriate for immediate transfer to home confinement. As of April 9, 2020, the BOP reports that 108 prisoners are incarcerated at the Camp, which represents 89 percent of the Camp's maximum capacity of 122 prisoners.[16]

---

[15] *See* BOP, "Population Statistics" (last updated Apr. 9, 2020), https://www.bop.gov/mobile/about/population_statistics.jsp.

[16] *Id.*

62.     As of April 7, 2020, FMC Devens had tested only 17 prisoners for

COVID-19—*less than two percent of the total population*.

63.     As of April 14, 2020, FMC Devens had not publicly reported any

confirmed COVID-19 cases among the prisoners or staff.

64.     Because of frequent asymptomatic transmission, as documented by the

CDC and DPH, and the lack of effective, widespread testing by the BOP, it is likely

that there already are, or soon will be, numerous undetected but highly contagious

COVID-19 infections among the prisoners and staff at FMC Devens.

65.     In other pending federal litigation, FMC Devens has reported, through

the DOJ, that numerous prisoners have developed symptoms of cough, shortness of

breath and/or fever, all common signs of infection with COVID-19.[17]

**Conditions at FMC Devens significantly increase the risk of COVID-19
infection, because they do not permit prisoners to engage in effective
social distancing.**

66.     In an "Imminent Danger Report" filed with the Occupational Safety

and Health Administration ("OSHA") on March 31, 2020, the President of the union

that represents many BOP staff reported health and safety hazards across many

BOP facilities—including FMC Devens—related to COVID-19, including:

    a.     Contrary to CDC guidelines, officials have directed staff

           throughout the BOP who have come into contact with, or been in

           close proximity to, individuals who show or have shown

---

[17] *See United States v. Turner*, No. 17-cr-132 (E.D. Pa.) (letter from U.S. Attorney's
Office to Judge Baylson) [DE #44 at 1].

symptoms of COVID-19, to report to work and not self-quarantine for 14 days;

b.     The BOP has violated CDC guidelines by continuously moving prisoners by bus and/or airlift to various prison sites across the nation, including infected prisoners, prisoners suspected of being infected, and prisoners who have been in close contact with, or proximity to, infected prisoners;

c.     The BOP has failed to introduce workplace controls to mitigate exposure or further exposure to the virus, such as high efficiency air filters to minimize the airborne nature of the virus or otherwise improve ventilation;

d.     The BOP has failed to minimize contact within recreation areas, education areas, counseling/treatment rooms, resulting in prisoners and staff coming in dangerously close contact with each other; and

e.     The BOP has failed to comply with OSHA Personal Protective Equipment Standards.[18]

---

[18] *Available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

**The Camp**

67.     The Camp houses mostly non-violent prisoners serving relatively short sentences and/or prisoners who are nearing their release dates.

68.     In the Camp at FMC Devens, it is impossible for prisoners, like Grinis, to stay at least six feet away from other prisoners and, therefore, to engage in effective social distancing, as the CDC has recommended. The conditions described below have persisted even *after* FMC Devens reportedly went into a "modified lockdown."

69.     Camp prisoners occupy a common, dormitory-style space that is divided into open cubicles that measure approximately 7 by 9 feet. The cubicles have no doors, and their dividing walls do not extend to the ceiling.

70.     Camp prisoners sleep in two-person bunk beds:  most cubicles contain two bunk beds (sleeping 4 prisoners); some contain one bunk bed (sleeping 2 prisoners).

71.     Camp prisoners are responsible for cleaning their own cubicles. These shared living spaces are not regularly and properly disinfected to prevent the spread of COVID-19.

72.     Camp prisoners share 12 common toilets, sinks, and showers.

73.     Camp prisoners are assigned to clean these facilities twice per day, and they are often unsanitary. The common toilets, sinks, and showers are not regularly and properly disinfected to prevent the spread of COVID-19.

74.     At mealtimes, Camp prisoners stand close together while waiting in line to be served, and they eat together in a common area at communal tables.

20

Neither the serving area nor the communal tables in the Camp are regularly and properly disinfected.

75.     Camp prisoners share 4 common telephones and 5 common computers, all of which are clustered closed together. These devices are not cleaned or disinfected after each prisoner uses them.

76.     Camp prisoners work in various buildings and areas throughout FMC Devens, where they have contact with other prisoners and staff. No accommodation is made for social distancing while cleaning facilities, operating laundry, serving food, or doing other assigned tasks.

77.     Camp prisoners have received no education regarding COVID-19 or guidance about reducing the risk of infection.

78.     Since early April, staff have encouraged Camp prisoners to wear masks, but the institution provides only 3 masks per month and has given no instructions about using or maintaining those masks. Prisoners have also been encouraged to wash their hands frequently.

79.     In the Camp, many but not all staff have recently started to wear masks, but they rarely wear gloves or other personal protective equipment.

80.     New prisoners continue to enter the Camp. Petitioners do not know if new arrivals are being tested or quarantined upon intake.

**The Medical Center**

81.     The Medical Center houses prisoners who require specialized or long-term medical treatment.

82.     In the Medical Center at FMC Devens, it is impossible for prisoners, like Gordon and Soliz, to stay six feet away from other prisoners and, therefore, to engage in effective social distancing. The conditions described below have persisted even *after* FMC Devens reportedly went into a "modified lockdown."

83.     The Medical Center is divided into separate units, such as the "H-B" unit where Gordon is assigned, and the "J-B" unit where Soliz is assigned. The H-B and J-B units are representative of the various housing units in the Medical Center.

84.     The H-B unit houses approximately 120 prisoners and occupies a large, dormitory-style common space that is divided into 65 open cubicles.

85.     Within the cubicles, H-B unit prisoners sleep in two-person bunk beds.

86.     H-B unit prisoners share 4 common toilets, 6 common urinals, and 6 common showers. The toilets, sinks, and showers in the unit are not regularly and properly disinfected.

87.     At mealtimes, prisoners in the H-B unit stand close together while waiting in line to be served, and typically, 4 or 5 prisoners eat together at communal tables. Neither the serving area nor the communal tables in the Medical Center are regularly and properly disinfected.

88.     Prisoners in the H-B unit routinely prepare and eat food in their shared cubicles or common areas. Within the housing unit, they share a single sink to clean cooking and eating utensils, and they also share 2 microwaves, an ice maker, and an ice dispenser. These appliances are not regularly and properly disinfected.

89.     Prisoners in the H-B unit share 4 common phones and 5 common computers, which are clustered closely together. These devices are not regularly cleaned after prisoners use them.

90.     Approximately 120 prisoners in the J-B unit occupy cells housing 2 prisoners each. The cells contain a shared sink and toilet and have doors that are closed and locked at night and during "count" times.

91.     Prisoners are responsible for cleaning their own cells, and the cells are not regularly and properly disinfected to prevent the spread of COVID-19.

92.     Prisoners in the J-B unit share 12 common showers, which are often unsanitary and contain used soap, used band-aids, used razors, and other potentially infected debris.

93.     Prisoners are responsible for cleaning the common showers, which are not regularly and properly disinfected to prevent the spread of COVID-19.

94.     Previously, prisoners in the J-B unit would leave the unit to eat meals in the dining hall, but recently, they have started bringing their meals back to their cells to eat. Prisoners continue to congregate close together while waiting in line to be served meals and while moving to and from the dining hall.

95.     In addition, dialysis patients from the J-B unit continue to eat in the dining hall in the mornings. Twelve prisoners sit close together at a single table.

96.     When medications are brought to the J-B unit, prisoners must stand in line next to each other to receive them.

97. The J-B unit contains 4 telephones and 5 computers that are clustered close together. These devices are not cleaned or disinfected between users.

98. When moving around FMC Devens, Medical Center prisoners are required to wait and to move in line, often only inches from each other.

99. Medical Center prisoners participate in recreation activities in common areas of FMC Devens, where they have access to common equipment and interact with prisoners from other housing units. No effort is made to disinfect recreation equipment or to maintain separation between prisoners from different units of the Medical Center.

100. Since early April, staff have encouraged Medical Center prisoners to wear masks, but the institution provides only 3 masks per month and has given no instructions about using or maintaining those masks.

101. In the Medical Center, many but not all staff have recently started to wear masks, but they rarely wear gloves or other personal protective equipment.

102. New prisoners continue to enter the Medical Center. Petitioners do not know if new arrivals are being tested or quarantined upon intake.

## CLASS ACTION ALLEGATIONS

103. Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

104. Petitioners bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated persons.

105.    Petitioners Grinis, Gordon, and Soliz each seek to represent a class of all persons in custody at FMC Devens ("Class"), including (1) a subclass of all persons who, according to applicable CDC guidelines, are at high risk of injury or death from COVID-19, due to their advanced age or medical condition(s) ("Medically Vulnerable Subclass"), and (2) a subclass of all persons who are appropriate candidates for early transfer to home confinement ("Home Confinement Appropriate Subclass") (collectively "Subclasses").

106.    Each Petitioner can represent the Class because each Petitioner is currently in custody at FMC Devens.

107.    The Subclasses substantially overlap. Each Petitioner can represent the Medically Vulnerable Subclass because each Petitioner is of such age and/or has such medical conditions that place him at a high risk of severe injury or death due to COVID-19. Each Petitioner can also represent the Home Confinement Appropriate Subclass, because each could be immediately transferred to home confinement.

108.    The action has been brought and may properly be maintained as a class action, because it satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

109.    Joinder of all proposed Class Members is impracticable, because (1) members of the Classes (including Subclasses) are numerous; (2) the Classes include future members; and (3) the Classes comprise incarcerated members who have limited ability to pursue individual relief, particularly in light of lockdowns,

restrictions on attorney and other visits, and other measures at FMC Devens as well as reduced access to this Court.

110.    More than 1,000 persons are members of the proposed Class and a substantial percentage of those persons are members of the Medically Vulnerable Subclass, the Home Confinement Appropriate Subclass, or both Subclasses.

111.    Common questions of law and fact exist as to all members of the proposed Class and Subclasses:  all prisoners at FMC Devens have constitutional rights to safe and secure conditions of confinement, including the right to engage in effective social or physical distancing to prevent the spread of COVID-19.

112.    Each Petitioner has a personal interest in the outcome of this putative class action and will fairly and adequately protect the interests of all Class Members. Petitioners have no interests that are adverse to the interests of the proposed Class or Subclasses.

113.    Petitioners are represented by *pro bono* counsel with experience and success in the prosecution of civil rights litigation, habeas corpus petitions, and class actions. Counsel for Petitioners are not aware of any conflicts among members of the proposed Class or between counsel and members of the proposed Class.

114.    Respondents have acted, and continue to act, on grounds generally applicable to all proposed Class Members, and this action seeks declaratory and injunctive relief. Petitioners therefore seek class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

115.    In the alternative, this putative class action satisfies the requirements

of Rule 23(b)(1), because prosecuting hundreds of separate actions would create a

risk of inconsistent or varying adjudications with respect to individual Class

Members that would establish incompatible standards of conduct for Respondents.

## LEGAL CLAIM

**Unconstitutional Conditions of Confinement
in Violation of the Eighth Amendment to the U.S. Constitution
(Declaratory and Injunctive Relief)**

116.    Petitioners incorporate by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

117.    The Eighth Amendment to the U.S. Constitution guarantees

Petitioners and all proposed Class Members the right to be free from cruel and

unusual punishment.

118.    Prison conditions that pose an unreasonable risk of serious harm to a

prisoner's health constitute cruel and unusual punishment where a prison official

has acted with deliberate indifference to that risk.

119.    Petitioners and all proposed Class Members face an unreasonable risk

of serious harm to their health from potential infection with COVID-19, which can

result in serious illness, permanent injury, and death.

120.    Although the serious risks from COVID-19 are obvious to Respondents,

they have nevertheless acted with deliberate indifference to the unreasonable risks

posed to Petitioners and all proposed Class Members.

121.   On a daily basis at FMC Devens, Respondents deny Petitioners and all proposed Class Members the ability to engage in effective social distancing—which the CDC has identified as critical to decreasing the risk of deadly infection—and in many cases, Respondents affirmatively require Petitioners and all proposed Class Members to engage in behaviors and activities that run directly contrary to recommended social distancing.

122.   Respondents have failed to use their authority to order compassionate release, 18 U.S.C. §§ 3582(c) and 4205(g), and/or transfer to home confinement, 18 U.S.C. § 3652(c)(2) and P.L. 116-136, 134 Stat. 281 (Mar. 27, 2020) ("CARES Act"), § 12003(b)(2), of prisoners with sufficient speed or in sufficient numbers to reduce the population of FMC Devens and, thereby, the imminent risk of serious illness and death from COVID-19.

## REQUEST FOR RELIEF

123.   Petitioners and Class Members respectfully request that the Court provide the following relief:

a.   Release sufficient Class Members on bail pursuant to this Court's inherent habeas corpus authority to ensure effective social distancing in compliance with CDC guidelines;

b.   Certify this Petition as a Class Action;

c.   Certify a Class of federal prisoners who are, or will be, in custody at FMC Devens; a Subclass of federal prisoners at FMC Devens who are medically vulnerable to severe infection and death from COVID-19 due to their age and/or medical condition(s)

("Medically Vulnerable Subclass"); and a Subclass of federal prisoners at FMC Devens who are appropriate candidates for immediate transfer to home confinement ("Home Confinement Appropriate Subclass");

d.      Declare that Respondents' policies, practices, actions, and inactions at FMC Devens violate the Eighth Amendment's prohibition against cruel and unusual punishment and that overcrowding is a cause of the violation;

e.      Enter a temporary restraining order or preliminary injunction ordering Respondents to comply with CDC guidance and best practices to prevent the spread of COVID-19, including, without limitation, by reducing the prisoner population at FMC Devens sufficiently to permit effective social distancing through either:

    i.   Compassionate release of Class Members pursuant to 18 U.S.C. §§ 3582(c) and 4205(g); or

    ii.  Transfers of Class Members to home confinement pursuant to P.L. 116-136, 134 Stat. 281 (Mar. 27, 2020) ("CARES Act"), § 12003(b)(2);

f.      Appoint a special master or expert under Fed. R. Evid. 706 to investigate conditions at FMC Devens, monitor compliance with this Court's orders, and make recommendations to the Court;

g.      Provide any further relief this Court deems appropriate.

Respectfully submitted,

ALEXANDER GRINIS, MICHAEL GORDON, ANGEL SOLIZ,
and others similarly situated,

By their attorneys,

_____/s/ William W. Fick_____
William W. Fick, BBO# 650562        Matthew R. Segal, BBO# 654489
Daniel N. Marx, BBO# 674523         Jessie J. Rossman, BBO #670685
Amy Barsky, BBO# pending            ACLU FOUNDATION
FICK & MARX LLP                     OF MASSACHUSETTS, INC.
24 Federal Street, 4th Floor        211 Congress Street
Boston, MA  02210                   Boston, MA  02110
857-321-8360                        (617) 482-3170
*wfick@fickmarx.com*                *msegal@aclum.org*
*dmarx@fickmarx.com*                *jrossman@aclum.org*
*abarsky@fickmarx.com*

## CERTIFICATE OF SERVICE

I, William Fick, certify that I have caused the foregoing document to be served by e-mail PDF upon AUSA Ray Farquhar, Civil Chief (D. Mass.), by email PDF on April 15, 2020.

Because the government declined to waive formal service under Fed. R. Civ. P. 4, on that same day, I traveled in person to a U.S. Post Office to send the document to the following recipients by certified U.S. Mail:

| | |
|---|---|
| U.S. Attorney's Office<br>Attn: Civil Process Clerk<br>One Courthouse Way<br>Boston, MA 02210 | Attorney General of the United States<br>950 Pennsylvania Ave NW<br>Washington, DC 20530 |
| Michael Carvajal, Director<br>Federal Bureau of Prisons<br>320 First St., NW<br>Washington, DC 20534 | Stephen Spaulding, Warden<br>FMC Devens<br>42 Patton Road<br>Devens, MA 01434 |

*/s/ William Fick*