# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER GRINIS, MICHAEL GORDON, and ANGEL SOLIZ, on behalf of themselves and those similarly situated,<br><br>        Petitioners,<br><br>v.<br><br>STEPHEN SPAULDING, Warden of Federal Medical Center Devens, and MICHAEL CARVAJAL, Director of the Federal Bureau of Prisons, in their official capacities,<br><br>        Respondents. | Civil Action No. 20-cv-10738-GAO |

## RESPONDENTS' OMNIBUS RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS AND OPPOSITION TO PETITIONERS' MOTION FOR IMMEDIATE BAIL AND INJUNCTIVE AND DECLARATORY RELIEF

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………………..iv

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

   I. THE COVID-19 PANDEMIC AND BOP'S RESPONSE...................................................... 3

   II. STEPS BEING TAKEN AT FMC DEVENS TO PREVENT COVID-19........................... 4

      A. Inmate Screening and Social Distancing .......................................................... 5

      B. Modification of Health Services ....................................................................... 8

      C. Isolation and Quarantine Procedures................................................................ 10

      D. Testing.............................................................................................................. 11

      E. Screening Staff and Visitors............................................................................. 11

      F. Cleaning............................................................................................................ 11

      G. Supplies............................................................................................................ 12

      H. Inmate and Staff Education.............................................................................. 13

   III. HOME CONFINEMENT AND COMPASSIONATE RELEASE ................................... 13

      A. Compassionate Release/Reduction In Sentence .............................................. 13

         1. Petitioners' Requests for Reduction in Sentence ......................................... 15

      B. Home Confinement .......................................................................................... 15

         1. Petitioners' Eligibility for Home Confinement............................................. 19

ARGUMENT ............................................................................................................. 21

I. PETITIONERS ARE NOT ENTITLED TO HABEAS RELIEF ........................................ 21

   A. Habeas Relief Is Unavailable To Challenge Conditions Of Confinement ..................... 21

   B. The PLRA Precludes The Relief That Petitioners Seek .................................................. 22

   C. Respondents Are Not Deliberately Indifferent To Petitioners' Medical Needs ............... 26

      1. Standard ........................................................................................................... 26

      2. Petitioners Cannot Establish Substantial Risk of Harm ................................... 28

      3. The BOP Has Taken Appropriate Measures To Protect The Health Of Inmates At FMC Devens .................................................................................................. 30

II. PETITIONERS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER OR ANY INJUNCTIVE RELIEF ............................................................................ 34

   A. Standard ........................................................................................................... 34

   B. Petitioners Are Unlikely To Succeed On The Merits Of Their Claims .......................... 35

      1. Petitioners' Allegations Regarding The Conditions At FMC Devens Are Inaccurate . 35

      2. Release Is Unlikely To Redress The Alleged Harm ....................................... 36

      3. Petitioners Are Not Entitled To Divest BOP Of Its Discretion To Place Inmates In Home Confinement In Appropriate Circumstances Or To Have The Court Amend Inmates' Criminal Sentences ....................................................................... 38

   C. Petitioners Fail To Establish Imminent Irreparable Harm ............................................. 40

   D. Granting Petitioners' Requested Relief Would Cause Substantial Harm To Others ....... 41

   E. Public Health And Safety Would Not Be Served By Granting The Requested Relief .... 42

III. PETITIONERS HAVE NOT PROVIDED A SUFFICIENT BASIS FOR CLASS
CERTIFICATION, AND CLASS-WIDE RELIEF WOULD LIKELY HARM MANY
INMATES..................................................................................................................... 43

CONCLUSION......................................................................................................................... 46

# TABLE OF AUTHORITIES

## CASES

*Abla v. Brinker Rest. Corp.*,
    279 F.R.D. 51 (D. Mass. 2011) ........................................................................... 43

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) ...................................................................... 45, 46

*Battista v. Clarke*,
    645 F.3d 449 (1st Cir. 2011) ...................................................................... 27, 28

*Bedford v. Wall*,
    No. C.A. 04-527L, 2005 WL 775904 (D. R.I. Mar. 31, 2005) ........................ 22

*Benjamin v. Jacobson*,
    172 F.3d 144 (2d Cir. 1999) ............................................................................. 24

*Bragdon v. Abbot*,
    524 U.S. 624 (1998) ......................................................................................... 33

*Brookens v. Am. Fed'n of Gov't Emps.*,
    315 F. Supp. 3d 561 (D.D.C. 2018) ................................................................. 37

*Brown v. Plata*,
    563 U.S. 493  (2011) ................................................................................... 23, 24

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ......................................................................................... 43

*Cameron v. Tomes*,
    990 F.2d 14 (1st Cir. 1993) .............................................................................. 28

*Chambers v. NH Prison*,
    562 F. Supp. 2d 197 (D. N.H. 2007) ............................................................... 34

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ........................................................................................... 43

*Corporate Technologies, Inc. v. Harnett*,
    943 F.Supp.2d 233 (D. Mass. 2013) ............................................................... 40

*Cortes-Quinones v. Jimenez-Nettleship*,
    842 F.2d 556 (1st Cir. 1988) ........................................................................... 27

*Crooker v. Grondolsky*,
  No. 12-12106-GAO, 2013 WL 101588 (D. Mass. Jan. 4, 2013)................................ 1, 21

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)................................................................................................ 36

*Dawson v. Asher*,
  No. C20-0409 JRL-MAT, 2020 WL 1304557 (W.D. Wash March 19, 2020)................ 31

*Denike v. Fauver*,
  3 F.Supp.2d 540 (D. New Jersey May 4, 1998).............................................................. 24

*Esso Standard Oil Co. v. Monroig-Zayas*,
  445 F.3d 13 (1st Cir. 2006)........................................................................................... 34

*Farmer v. Brennan*,
  511 U.S. 825 (1994)..................................................................................... 26, 27, 28, 30

*Ferranti v. Moran*,
  618 F.2d 888 (1st Cir. 1980)...................................................................................... 27, 32

*Gaudreault v. Mun. of Salem*,
  923 F.2d 203 (1st Cir.1990).......................................................................................... 26

*Gilmore v. People of the State of Cal.*,
  220 F.3d 987 (9th Cir. 2000) ....................................................................................... 24

*Graham v. Sabol*,
  734 F.Supp.2d 194 (D. Mass. 2010) ............................................................................ 21

*Helling v. McKinney*,
  509 U.S. 25 (1993)....................................................................................................... 26

*Hickox v. Christie*,
  205 F. Supp. 3d 579 (D.N.J. 2016) .............................................................................. 33

*Hines v. Youssef*,
  No. 1:13-cv-*00357*-AWI-JL, 2015 WL 164215 (E.D. Cal. Jan. 13, 2015) ..................... 29

*In re Relafen Antitrust Litig.*,
  218 F.R.D. 337 (D. Mass. 2003)................................................................................... 43

*Inmates of Occoquan v. Barry*,
  844 F.2d 828 (D.C. Cir. 1988)...................................................................................... 24

*Inmates of Suffolk Cty. Jail v. Rouse*,
129 F.3d 649 (1st Cir. 1997) ........................................................................... 24

*Jacobson v. Comm. of Massachusetts*,
197 U.S. 11 (1905) ......................................................................................... 32

*Johnson v. Moran*,
812 F.2d 23 (1st Cir. 1987) ............................................................................ 21

*Kamara v. Farquharson*,
2 F.Supp.2d 81 (D. Mass. 1998) ............................................................... 21, 22

*Kane v. Winn*,
319 F.Supp.2d 162 (D. Mass. 2004) ............................................................... 21

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014) .................................................................. 26, 27, 32

*Leavitt v. Corr. Med. Servs.*,
645 F.3d 484 (1st Cir.2011) ........................................................................... 26

*Lopes v. Riendeau*,
177 F.Supp.3d 634 (D. Mass. 2016) ............................................................... 27

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................... 36

*Mays v. Dart*,
___ F.Supp.3d ___, 2010 WL 1812381 (N.D. Ill. Apr. 9, 2020) ...................... 30

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ....................................................................................... 34

*McLaughlin v. MacDonald*,
Civil Action No. 11-11587-JLT, 2012 WL 4058063 (D. Mass. Aug. 22, 2012) ............. 22

*Mell v. United States*,
No. 3:20-cv-2277 (BRM), 2020 WL 1852384 (D. New Jersey Apr. 13, 2020) ............... 29

*Money v. Pritzker*, ___ F. Supp. 3d ___, Nos. 20-cv-2093 & 20-cv-2094,
2020 WL 1820660 (N.D. Ill. Apr. 10, 2020) ..................................... 25, 31, 44

*Muhammad v. Close*,
540 U.S. 749 (2004) ....................................................................................... 22

*Nadeau v. Helgemoe,*
    561 F.2d 411 (1st Cir. 1977) ........................................................................ 28

*Nelson v. Campbell,*
    541 U.S. 637 (2004) ................................................................................. 1, 22

*Payne v. Goodyear Tire & Rubber Co.,*
    216 F.R.D. 21 (D. Mass. 2003) ................................................................. 45

*Perkins v. Kan. Dep't of Corr.,*
    165 F.3d 803 (10th Cir. 1999) .................................................................... 32

*Perry v. Roy,*
    782 F.3d 73 (1st Cir. 2015) .......................................................... 26, 27, 30

*Planned Parenthood League of Mass. v. Bellotti,*
    641 F.2d 1006 (1st Cir. 1981) .................................................................... 34

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) .................................................................................... 21

*Rosario v. Brown,*
    670 F.3d 816 (7th Cir. 2012) ...................................................................... 31

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
    102 F.3d 12 (1st Cir. 1996) ................................................................... 34, 35

*Ruiz-Rosa v. Rullan,*
    485 F.3d 150 (1st Cir. 2007) ...................................................................... 27

*Sanchez v. Sabol,*
    539 F.Supp.2d 455 (D. Mass. 2008) ......................................................... 21

*Sch. Bd. of Nassau Cty., Fla. v. Arline,*
    480 U.S. 273 (1987) .................................................................................... 33

*Scott v. Benson,*
    742 F.3d 335 (8th Cir. 2014) ...................................................................... 32

*Sires v. Berman,*
    834 F.2d 9 (1st Cir. 1987) .......................................................................... 26

*Spectrum Five LLC v. FCC,*
    758 F.3d 254 (D.C. Cir. 2014) .................................................................... 36

*Sperling v. Grondolsky,*
    No. 17-12075-PBS, 2018 WL 1904177 (D. Mass. Apr. 20, 2018) ................................. 21

*United States ex rel. Siegel v. Shinnick,*
    219 F. Supp. 789 (E.D.N.Y. 1963) ................................................................................ 33

*United States v. Desage*, No. 2:13-cr-00039-JAD-VCF,
    2020 WL 1904584 (D. Nev. Apr. 17, 2020) .................................................................. 31

*United States v. Gileno,*
    No. 3:19-cr-161, 2020 WL 1307108 (D. Conn. Mar. 19, 2020) .................................... 28

*United States v. Hamilton,*
    No. 19-CR-54-01, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020) .................................. 28

*United States v. Jefferson,*
    No. CCB 19-487, 2020 WL 1332011 (D. Md. Mar. 23, 2020) ...................................... 28

*United States v. Martin,*
    No. PWG-19-140-13, 2020 WL 1274857 (D. Md. Mar. 17, 2020) ................................ 28

*United States v. Passley,*
    2020 WL 1815834 (E.D.N.Y. Apr. 9, 2020) ................................................................. 29

*United States v. Steward,*
    No. S1:20-cr-0052 (DCL), 2020 WL 1468005 ............................................................. 41

*United States v. Taylor,*
    No. 5:19-CR-192-KKC-MAS, 2020 WL 1501997 (E.D. Ky. Mar. 26, 2020) ................ 41

*United States v. Villegas,*
    2020 WL 1649520 (C.D. Cal. Apr. 3, 2020) ................................................................ 30

*United States, v. Rollins,*
    Nos. 19-CR-34S, 11-CR-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) ............. 28

*Vaqueria Tres Monjitas, Inc. v. Comas,*
    980 F.Supp.2d 65 (D. Puerto Rico Sept. 23, 2013) ........................................................ 23

*Verhoeven v. Brunswick School Committee,*
    207 F.3d 1 (1st Cir. 1999) ............................................................................................. 34

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) ...................................................................................................... 36

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ...................................................................................................... 43

*Warner v. Spaulding,*
    Civil Action No. 18-cv-10850-DLC, 2018 WL 9838349 (D. Mass. Sept. 24, 2018) ....... 22

*Wilson v. Seiter,*
    501 U.S. 294 (1991) ................................................................................... 27, 28

*Winter v. NRDC,*
    555 U.S. 7 (2008) ..................................................................................... 34, 40

*Youngberg v. Romeo,*
    457 U.S. 307 (1st Cir. 2011) ............................................................................ 28

## STATUTES AND RULES

18 U.S.C. § 3582(c)(1)(A) ...................................................................................... 14, 39

18 U.S.C. § 3621(b) ...................................................................................................... 38

18 U.S.C. § 3624(c) ....................................................................................................... 41

18 U.S.C. § 3624(c)(2) ...................................................................................... 16, 18, 38

18 U.S.C. § 3626 ....................................................................................................... 1, 22

18 U.S.C. § 3626(a)(2) ................................................................................................... 23

18 U.S.C. § 3626(a)(3)(B) ................................................................................... 1, 23, 25

18 U.S.C. § 3626(g)(2) .............................................................................................. 23, 25

18 U.S.C. § 3626(g)(4) ................................................................................................... 24

18 U.S.C. § 4205(g) .................................................................................................. 14, 39

18 U.S.C. § 3582 ............................................................................................... 14, 39, 41

28 U.S.C. § 2241 ...................................................................................................... 1, 21

34 U.S.C. § 60541 .................................................................................................... 16, 17

Fed. R. Civ. P. 23 ........................................................................................................... 43

Fed. R. Civ. P. 23(a) ................................................................................................... 3, 44

Fed. R. Civ. P. 23(a)(2)........................................................................................................ 44

Fed. R. Civ. P. 23(b) ........................................................................................................... 43

Pub. L. No. 116-136…………………………………………………………………………….18, 38

## INTRODUCTION

The Bureau of Prisons ("BOP") and the Federal Medical Center in Devens, Massachusetts ("FMC Devens") have taken extensive measures to prevent and treat COVID-19 among inmates. Despite these substantial efforts, Petitioners Alexander Grinis, Michael Gordon, and Angel Soliz (collectively, "Petitioners"), have filed a *Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Complaint for Injunctive and Declaratory Relief* (the "Petition") seeking, *inter alia*, release from incarceration for themselves, and for all putative class members, certification of the Petition as a class action, and a declaratory judgment that official-capacity Respondents' FMC Devens Warden Steven Spaulding, and BOP Director Michael Carvajal (collectively, "Respondents") policies and practices in the wake of the COVID-19 pandemic violate the Eighth Amendment's prohibition against cruel and unusual punishment.  ECF No. 1.  By their *Motion for Immediate Bail Consideration, Temporary Restraining Order, and Preliminary Injunctive Relief* (the "Motion"), Petitioners seek release of class members to "ensure effective social distancing at FMC Devens in compliance with CDC guidelines," and ask this Court to order injunctive relief compelling Respondents to comply with CDC guidelines.  ECF No. 3.

Petitioners claims are without merit and fail on several grounds.  First, it is well-settled that a challenge to conditions of confinement by a habeas petition under 28 U.S.C. § 2241 is improper. *Crooker v. Grondolsky*, No. 12-12106-GAO, 2013 WL 101588, at *2 (D. Mass. Jan. 4, 2013); s*ee also Nelson v. Campbell*, 541 U.S. 637, 643 (2004).  Second, the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, places strict limitations on a court's ability to order the release of inmates "in any civil action in Federal court with respect to prison conditions …"  and precludes a single district judge from doing so, as Petitioners request.  18 U.S.C. § 3626(a)(3)(B).  Third, Petitioners cannot establish that Respondents have been deliberately indifferent to their medical

needs.  As explained further, *supra*, FMC Devens has taken appropriate steps to mitigate the risk of COVID-19 throughout its inmate population, including implementing the BOP's national response to prevent the introduction and spread of COVID-19 into the BOP, and implementing a number of other measures at FMC Devens including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and a number of other preventative measures.

Similarly, Petitioners' request for emergency and injunctive relief must likewise fail.  First, Petitioners are unlikely to succeed on the merits of their claims because the conditions at FMC Devens are markedly different than those portrayed in the Petition.  Contrary to Petitioners' claims, FMC Devens has taken numerous measures to comply with CDC and BOP guidelines in an effort to prevent the introduction and spread of COVID-19 in the institution.  Second, this Court is without legal authority to order the release of prisoners.  Third, Petitioners cannot show irreparable injury.  The measures that FMC Devens has put in place reduces the risk that persons with COVID-19 will enter FMC Devens at the outset, and will prevent the spread of coronavirus within FMC Devens.  Moreover, Petitioners fail to address in any meaningful way how, if released, they will be safer from the risk of infection or have access to adequate care if they do become infected.  Fourth, Petitioners' demand for the immediate release and removal of a substantial portion of the population at FMC Devens would likely cause substantial harm to other class members, as well as to the general public.  Finally, the public interest would not be served by granting the relief that Petitioners seek.  The immediate release of hundreds of inmates would pose profound risks to the public from released prisoners who have been convicted of serious crimes, and potentially causing additional criminal activity in the communities where they have been released.

Finally, Petitioners seek class certification of every current and future inmate at FMC Devens.  This Court should deny Petitioners' request for class certification as Petitioners cannot demonstrate that the proposed class satisfies all four requirements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation.  The proposed class members' individual cases vary widely, and there is simply no commonality and typicality among the proposed class members, other than the fact of their incarceration at FMC Devens.  Similarly, Petitioners' demand for a dramatic remedy of release would have a profound effect on members of the class without considering the impact on the entirety of the class.  Their failure to consider or account for such concerns in the immediate and sweeping relief that they seek demonstrates that Petitioners do not adequately represent the putative class.

For these reasons, as more fully set forth below, Respondents submit this Omnibus Response and Opposition to the Petition and Motion, and ask this Court to deny the Petition, deny class certification, and deny the injunctive and declaratory relief that Petitioners seek.

## STATEMENT OF FACTS

### I.   THE COVID-19 PANDEMIC AND BOP'S RESPONSE

The Federal Bureau of Prisons ("BOP") has been monitoring and tracking the spread of COVID-19 since January 2020 when the first cases of the virus appeared in the United States. *See* Declaration of Megan Shaw, M.D. ("Shaw Decl.") at ¶ 6, attached hereto as Exhibit A. Recognizing the threat that this virus could pose to its inmate population, the BOP began quickly organizing its national pandemic response into a multiphase "Action Plan," implementing a variety of protocols in response to the rapidly shifting landscape of this pandemic across the United

States.[1]   Some of the measures that the BOP has, on a nationwide basis, taken include implementing screening requirements for inmates and staff; temporarily suspending social visits, legal visits, inmate transfers, official travel, and contractor access; updating its quarantine and isolation procedures; and instituting a "modified operations" plan, which directs BOP facilities to adjust their daily operations in a manner that permits inmates to engage in physical distancing while in common areas, such as during mealtimes and recreation.  *Id.*

On March 31, 2020, the BOP ordered all inmates to remain secured in their assigned cells or quarters for a period of 14 days (to be re-evaluated at the conclusion of that time period) in order to decrease the spread of the virus.  Shaw Decl. ¶ 16.  On April 13, 2020, the BOP ordered an extension of the April 1, 2020 modified operations order through May 18, 2020.  Shaw Decl. ¶ 17.

## II.   STEPS BEING TAKEN AT FMC DEVENS TO PREVENT COVID-19

FMC Devens is an Administrative security level institution designed to house approximately 1,200 inmates at the main facility and approximately 128 inmates at the adjacent Federal Prison Camp ("FPC").  *See* Declaration of Amber Bourke ("Bourke Decl."), attached hereto as Exhibit B, at ¶ 3.  The main Federal Medical Center ("FMC") facility and the FPC are separate facilities, and the inmate populations do not interact.[2]  *Id.*  FMC Devens offers specialized services for sex offenders, specifically the Sex Offender Management Program.  Bourke Decl. ¶ 4.

FMC Devens has implemented BOP's national action plan, in compliance with BOP's national directives, and has also taken numerous other measures to fight the introduction and spread of COVID-19 within its facilities including providing inmate and staff education;

---

[1] These protocols are discussed at length in Dr. Shaw's Declaration.  *See* Ex. A.

[2] "FMC Devens" refers to both the FMC and the FPC, unless otherwise stated.

conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures. Shaw Decl. ¶ 19.  As a result, as of April 21, 2020, there were no confirmed cases of COVID-19 at FMC Devens[3].  Shaw Decl. ¶ 65.

From the outset of the COVID-19 pandemic, FMC Devens officials have provided regular updates to inmates and staff regarding the virus and BOP's response, and have educated inmates and staff regarding measures that they should take to stay healthy.  Shaw Decl. ¶ 20.  The measures that FMC Devens has taken to insure the health and safety of its staff and inmates includes, but is not limited to, the following:[4]

A.    Inmate Screening and Social Distancing

FMC Devens has implemented extensive measures to screen inmates for COVID-19, for both newly arriving inmates and its resident inmate population.  All new inmates are screened for any fever or symptoms.  Shaw Decl. ¶ 26.  They are then placed in an automatic 14-day quarantine before being released to their housing units.  *Id*.  If the inmate exhibits any symptoms of coronavirus, the inmate is tested, treated and placed in the Isolation Unit.  *Id*.  Resident inmates who are admitted to an outside hospital and/or emergency room are also placed on a 14-day quarantine upon their return to FMC Devens.  *Id*.  FMC Devens is also screening every inmate,

_____

[3] Upon information and belief, on April 22, 2020, FMC Devens had its first inmate test positive COVID-19.  The inmate has only had one test thus far, and is awaiting a second test to confirm the results.  The inmate has been in quarantine status since his return from surgery at an outside hospital.  He is not currently at FMC Devens because he has been re-admitted to the hospital due to complications from surgery.

[4] A detailed description of the efforts the FMC Devens has taken to prevent the introduction and spread of COVID-19 at FMC Devens is set forth in Exhibit A.

every day, for fever and/or symptoms of COVID-19.   Shaw Decl. ¶ 26.  Any inmate with signs and/or symptoms of COVID-19 is removed from the housing unit and isolated away from all other inmates.  *Id*.  In addition, the inmate is immediately tested for COVID-19.  *Id*.

All inmate activities have been separated by housing unit and floor in order to "shelter in place" with the fewest number of fellow inmates.  Shaw Decl. ¶ 31.  Every housing unit at FMC Devens has been sheltering in place, and any inmate needing to be reassigned to another housing unit has been quarantined off of that unit for 14 days prior to reassignment.  *Id*.  Each floor of each unit has designated times for meals, recreation, laundry, commissary, education, the law library, book cart distribution, and job assignments.  *Id*.  The staff dining hall has been closed during modified movement enforcement.  Shaw Decl. ¶ 54.  Inmate meals have been changed to "grab and go" meals, with Virucide cleaning in between the different unit/floor meal times.  Shaw Decl. ¶ 55.  In addition, sick call visits, pill lines, insulin administration and all inmate medical screening has been moved to the inmates' specific units so they can shelter in place while still receiving their medications and daily visits from medical staff.  Shaw Decl. ¶ 31.  Soap and sanitizer have also been made available to everyone.  *Id*.

All inmate companions have been moved to the units where they are assigned to work so that they are sheltering in place with their inmates.  Shaw Decl. ¶ 50.  All orderlies have been assigned to work areas by unit and floor so they are working with the same inmates that they have been sheltering in place with.  Shaw Decl. ¶ 51.

The Memory Disorder Unit ("MDU") at FMC Devens is a uniquely situated 'locked' unit which has been sheltering in place since March, 2020.  Shaw Decl. ¶ 59.  A locked unit is one where very few staff are allowed access and where MDU patients are not exposed to other FMC Devens inmates.  *Id*.  As a result, MDU patients have very limited contact with anyone outside of

6

their unit, and if an inmate were to develop symptoms, he may be easily isolated from other patients via the doors to each individual cell. *Id.* In addition, all inmate companions within the MDU have been sheltering in place with the inmate to whom they are assigned to decrease the exposure of both inmates to any other inmates or staff. *Id.* These inmate companions have not returned to their initial housing units and have been reassigned to live on the units where they are designated as companions. *Id.*

As inmates are sheltering in place with their respective floor, additional physical barriers, currently under construction, are being erected in housing units in order to further decrease the number of inmates who are sheltering in place together. Shaw Decl. ¶¶ 31, 53. Each floor or each unit will be further subdivided and the separate groups will be quarantined from each other, just as inmates on separate floors and in different housing units are. Shaw Decl. ¶ 53.

The adjacent Federal Prison Camp ("FPC Devens" or the "Camp") at FMC Devens houses only Care Level 1 and 2 inmates. Shaw Decl. ¶ 61. These Camp inmates have a much smaller incidence of the CDC risk factors for increased mortality with COVID than FMC Devens' elderly and more medically complicated Care Level 3 and 4 inmates at the main institution. *Id*. The Camp as a whole is sheltering in place and Health Services is providing medical care and pill line at the Camp. Shaw Decl. ¶ 62. In addition, any Camp inmates needing to go to the FMC Health Services Division or Dental are being assigned a staggered scheduling time so that they are not exposed to any other inmates. *Id*.

At the Camp, inmates are also screened daily for symptoms of COVID and fever in the same manner as the inmates at FMC Devens. Shaw Decl. ¶ 60. If an inmate develops symptoms, he is brought inside FMC Devens for isolation. *Id*. An Isolation Examination Room has been established at the Camp in order to immediately isolate any inmate away from the rest of the Camp

inmates if he were to develop symptoms, and which also provides a place behind a closed door for the inmate.  *Id.*  Work assignments have been changed so that none of the inmates are going into the community to work on furlough, and all jobs have been assigned to within the Camp itself.  *Id.*

FPC staff are being screened prior to work at the Camp with the same enhanced screening procedures as the FMC.  Shaw Decl. ¶ 63.  Additionally, staff and inmates at the Camp are also required to wear face masks at all times.  *Id.*

Camp inmates are being evaluated for the expanded Home Confinement program, as set forth by Central Office in the same program offered to our FMC Devens main institution inmates.  Shaw Decl. ¶ 61.

B.    Modification of Health Services

FMC Devens Health Services has modified all medication administration in response to the COVID-19 pandemic.   Inmates have been educated by health services staff on social distancing, risk factors for COVID-19, modification of schedules and changes to sick call procedures so that all inmates have continued to have access to medical staff on a daily basis.  Shaw Decl. ¶ 49.

All inmates entering the hospital building are screened prior to entrance on a daily basis.  Shaw Decl. ¶ 35.  The P-Unit building (originally designed as an Army hospital) has been placed in a modified lock down with no movement in between the floors, and all medication administration and meals are distributed on the floors separately.  Shaw Decl. ¶ 36.  At the onset of inmates sheltering in place on the units, inmates on dialysis and those who were currently taking immunosuppressive medication were moved to units that had cell doors so they could shelter in place with more physical barriers and a smaller number of inmates.  Decl. ¶ 37.  Dialysis inmates are screened prior to entering dialysis on a daily basis.  Shaw Decl. ¶¶ 27, 34.  They are then given

"grab and go meals" to take back to their unit so they are not exposed to other inmates on the compound during scheduled moves. Shaw Decl. ¶ 27. Any inmate on Isolation or Quarantine is dialyzed in the negative pressure isolation room in dialysis. Shaw Decl. ¶ 34. Transplant teams were notified of modified lock down procedures by FMC Devens' Transplant Coordinator. Shaw Decl. ¶ 38. FMC Devens' telemedicine program for inmate appointments was increased for all of the transplant inmates who required visits and that could be accomplished by video or conference call. *Id*. Telemedicine expansion was also increased with FMC Devens' local contractors for inmates who were not transplant inmates but who required visits that could be done by video or conference call. *Id*.

All scheduled medical trips were audited for urgency and any trips that could be rescheduled without adversely affecting the health of the inmate have been cancelled and rescheduled. Shaw Decl. ¶ 28. Inmates who must attend scheduled medical appointments are monitored for fever and symptoms for 14 days by nursing upon their return from the appointment. Shaw Decl. ¶ 28. Escort officers have been tested and given PPE to wear during scheduled medical trips out of the institution. Shaw Decl. ¶ 29.

Medications are administered to the inmates in the units where they are sheltering in place. Shaw Decl. ¶ 32. Insulin is now given out on the unit, rather than requiring inmates to report to an insulin line. *Id*. "Call-outs" to Medical for medical visits have been modified to allow only inmates from the same floor and unit, who are sheltering in place together, to be in the Medical Unit at the same time. *Id*. Medical Exam rooms have been established on each unit to enable medical providers to see inmates at their shelter in place location. Shaw Decl. ¶ 40. All Chronic Care and 14-day visits are taking place on the units or in the Quarantine area. *Id*. Medical providers were assigned to report to FMC Devens on each day of the weekend to evaluate any

inmate in the Isolation area, and to test and/or isolate any inmate with symptoms of coronavirus. Shaw Decl. ¶ 41.  Lab Techs are sent to units to draw blood, and radiology services have been coordinated so that only inmates on the same floor and unit are in the waiting room at the same time.  Shaw Decl. ¶ 42.

New dental procedures have been initiated by the acting Chief Dentist.  Shaw Decl. ¶ 43. Dental visits have also been moved to the units, and procedures are scheduled by individual inmate so that there is no exposure to other units/floors in the dental waiting room.  *Id*.

FMC Devens staff are also enforcing social distancing guidelines.  Shaw Decl. ¶ 23.  Crisis Support Team staff have been deployed to discuss concerns and anxieties with both staff and inmates.  Shaw Decl. ¶ 56.

C.  Isolation and Quarantine Procedures

FMC Devens has established Isolation and Quarantine areas for symptomatic and asymptomatic inmates.  Two separate ranges were established for Isolation (symptoms) and Quarantine (asymptomatic) inmates.  Shaw Decl. ¶ 22.  These areas are physically separated from the other housing units and are identified with signs prior to entering the unit.  *Id*.  Staff have been educated on use of correct PPE for each range and PPE carts have been set up for easy donning and doffing of PPE.  *Id*.

Two examination rooms in the Health Services Unit at FMC Devens have been set aside for evaluation and testing of any symptomatic inmates.  Shaw Decl. ¶ 23.  Inmates with any symptoms of coronavirus, such as a cough or fever, are given a mask and escorted to these special exam rooms.  *Id*.  These rooms also have doors capable of closing and being locked, and all of the examination rooms are equipped with gowns, face shields, N95 masks and Virucide capable killing the coronavirus.  *Id*.  Inmates are tested for COVID-19, the placed in the separated Isolation Range,

10

where they are isolated from all other inmates and staff.  *Id.*

D.    Testing

FMC Devens is conducting testing in accordance with CDC guidelines.  The CDC has explained that "[n]ot everyone needs to be tested for COVID-19," and "decisions about testing are at the discretion of state and local health departments and/or individual clinicians."  *See* cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html (last visited on Apr. 22, 2020).

As set forth above, FMC Devens has tested any symptomatic inmates.

E.    Screening Staff and Visitors

All individuals entering FMC Devens must undergo a health screening prior to entry. Enhanced screening of staff is taking place.  Shaw Decl. ¶ 24.  All staff entering the institution are screened for any fever and symptoms of COVID-19.  *Id.*  Staff who are exhibiting any symptoms or fever are sent home and a medical officer is assigned to contact the staff person and determine when it will be safe and appropriate for the staff member to return to FMC Devens.  *Id.*

All Food Service Workers are screened on a daily basis.  Shaw Decl. ¶ 33.  Medical contractors have been notified that they will be screened prior to entry, and any clinics that could be cancelled and rescheduled have been changed to avoid further exposure to community physicians.  Shaw Decl. ¶ 30

F.    Cleaning

Sanitation crews at FMC Devens are working days and evenings with chemicals that kill COVID-19.  Shaw Decl. ¶ 33.  Virucide has been given to all Health Services employees to clean their areas several times a day, and between any inmate visits, paying special attention to the visits from different units and or floors.  Shaw Decl. ¶ 44.  Inmates have been given access to Virucide to clean their cells and common areas several times a day.  Shaw Decl. ¶ 46.

Door holders have been established so that not all inmates are touching door handles as they are moving to and from their units. Shaw Decl. ¶ 45. Staff keys and radios are disinfected with Virucide before redistribution to staff each day. Shaw Decl. ¶ 47.

G.    Supplies

Since April 8, 2020, all inmates and staff are required to wear masks at all times in the institution to help decrease any exposure to respiratory droplets or secretions. Shaw Decl. ¶¶ 48, 63. Inmates are subject to discipline if they fail to wear a mask. Shaw Decl. ¶ 48.

Correctional staff have been provided PPE to be used in appropriate locations throughout FMC Devens such as quarantined areas, isolation units, and screening sites. All PPE was inventoried and PPE carts were established in each of the units for staff and officers to use during visits to the units. Shaw Decl. ¶¶ 22, 39. Escort officers have been given PPE to wear during scheduled medical trips outside of FMC Devens. Shaw Decl. ¶ 29.

In addition to the institution-supplied soap available to the inmate population, they can purchase Dove anti-bacterial and Irish Spring bar soap from the commissary. Shaw Decl. ¶ 31. Both inmates and staff have widespread access to alcohol-free sanitizers. *Id*. Finally, in accordance with March 15, 2020, guidance from the FDA allowing BOP to make its own sanitizer, FMC Devens pharmacy has manufactured 75% isopropyl alcohol antiseptic topical solution hand sanitizer, which is issued to staff only. *Id*. Pharmacy staff located and secured Hydroxychloroquine[5] per the Emergency Use Authorization for oral formulations of this medication in for inmates hospitalized with COVID-19. Shaw Decl. ¶ 58.

---

[5] Hydroxychloroquine is a drug used to prevent or treat malaria and is being used in clinical trials for treatment of patients with COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/therapeutic-options.html (last visited Apr. 22, 2020).

H.     Inmate and Staff Education

As set forth above, from the outset of the COVID-19 pandemic, FMC Devens staff and officials have provided regular education to inmates and staff regarding the virus, the BOP's response, and the measures that they themselves should take to stay healthy, including washing their hands frequently with soap and water, avoiding touching their faces, and practicing physical distancing whenever possible.  In addition to the measures previously set forth, inmates have been educated by health services staff on social distancing, risk factors for COVID-19, and modification of schedules and changes to sick call procedures so that all inmates continue to have access to medical staff on a daily basis.  Shaw Decl. ¶ 49.  The Warden continues to hold a "Town Hall" with inmates and provides weekly updates each Thursday to the inmate population through the BOP's electronic messaging system.  Shaw Decl. ¶ 64.

Health Services staff developed a tool to identify the high-risk inmates per the CDC website definition (https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html) and are screening these inmates for referral to Expanded Home Confinement in conjunction with the Unit Team.  Shaw Decl. ¶ 57.  This analysis includes education and collaboration between the inmate and his medical provider on whether his risks for COVID-19 are greater at home or at the institution.  *Id.*  In addition, Health Services is diligently completing the medical summaries necessary to process the Reduction in Sentence/Compassionate Release requests that have been requested and are complying with all deadlines for this important process.  *Id.*

III.    **HOME CONFINEMENT AND COMPASSIONATE RELEASE**

A.     Compassionate Release/Reduction In Sentence

The BOP does not have the authority to provide inmates with "early release."  Bourke Decl. ¶ 5.  A reduction of an inmate's federal sentence can only be accomplished by an Article III judge,

and specifically, the inmate's sentencing judge.  *Id.*  However, upon an inmate's request, the Director of BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A).  This process is outlined in the U.S. Dep't of Justice Fed. Bureau of Prisons, *Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Program Statement 5050.50 (Jan. 17, 2019)[6].  *Id.*  The BOP invokes these statutory authorities in "extraordinary or compelling circumstances," which could not have reasonably have been foreseen by the court at the time of sentencing.  *Id.*  The First Step Act, codified at 18 U.S.C. § 3582, specifies that an inmate may file a Motion for Reduction of Sentence directly to the sentencing court after exhaustion of administrative remedies, or 30 days from the date the Warden receives such a request from the inmate, whichever is earlier.  *Id.*  The determination of release is ultimately the decision of the sentencing court.  *Id.*

Approximately 114 FMC Devens inmates have submitted a request for Compassionate Release/Reduction in Sentence ("RIS") by FMC Devens inmates within the past two weeks. Bourke Decl. ¶ 6.  Of these, FMC Devens has determined that 2 of these RIS requests meet the criteria, and have been forwarded to the BOP Central Office for further RIS consideration and approval.  *Id.*  It is important to note that, while the BOP is processing these requests as expeditiously as possible, the statute gives the BOP thirty (30) days to evaluate compassionate release requests before any motion may be presented in the sentencing court.  18 U.S.C. § 3582(c)(1)(A).  Indeed, the ultimate decision regarding compassionate release lies with the sentencing judge.  *Id.*

---

[6] This BOP Program Statement and all other program statements and operations memoranda cited herein are available at www.bop.gov via the Resources link.  Bourke Decl. ¶ 5.

1.      Petitioners' Requests for Reduction in Sentence

Each of the Petitioners was reviewed for a RIS by FMC Devens.  Bourke Decl. ¶ 7.

Petitioner Michael Gordon submitted a RIS request on April 13, 2020, and was denied on April 20, 2020.  Bourke Decl. ¶ 8.  He sought release based on the potential effects of a COVID-19 infection, which alone does not meet the necessary criteria for a RIS under BOP policy.  *Id*.

Petitioner Alexander Grinis ("Grinis") submitted a RIS request on April 17, 2020, and was denied on April 21, 2020.  Bourke Decl. ¶ 7.  The sole basis upon which Grinis sought release was potential COVID-19 infection.  *Id*.    The request did not meet the criteria for RIS under BOP policy.  *Id*.

Petitioner Angel Soliz ("Soliz") submitted a RIS request on August 19, 2019, and was denied on September 3, 2019.  Bourke Decl. ¶ 9.  At the time he was denied RIS, Soliz did not have an end-of-life trajectory that met the necessary criteria for a RIS under BOP policy.  *Id*.

B.      Home Confinement

At the Attorney General's direction, the BOP has also significantly increased the number of inmates on home confinement by over 40% and continues to screen all inmates to determine whether they are appropriate for home confinement.[7]  By memoranda dated March 26, 2020, and April 3, 2020, the Attorney General directed the BOP to "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."  *See* Attorney General Memoranda dated March 26, 2020 (Exhibit C) and April 3, 2020 (Exhibit D), attached hereto.  In assessing which inmates should be granted home

_____

[7]  See   https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 22, 2020).

15

confinement, the Attorney General directed the BOP to consider the totality of the circumstances of each inmate, the statutory requirements for home confinement, and a series of factors including the age and vulnerability of the inmate, the security level of the facility holding the inmate, the inmate's conduct while incarcerated, the inmate's score under the Prisoner Assessment Tool Targeting Estimated Risk and Needs, whether the inmate has a demonstrated and verifiable reentry plan that will prevent recidivism and ensure public safety (including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face at their current facility), and the inmate's crime of conviction.  Exhibit C, at 1-2.  In addition to these factors, before granting an inmate release on home confinement, the Attorney General directed the BOP Medical Director, or his designee, "to make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement."  *Id*. at 2.  FMC Devens is following this guidance.  Shaw Decl. ¶ 57.

Although BOP lacks the authority to release an inmate from his sentence, BOP has the authority to transfer a prisoner to home confinement for the remainder of his or her sentence pursuant to provisions and limitations set forth 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  *See also* BOP Program Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home Confinement under the First Step Act*.  Bourke Decl. ¶ 10.  Generally, the BOP may place a prisoner in home confinement only for the shorter of 10 percent of the term of imprisonment or 6 months.  18 U.S.C. § 3624(c)(2).  Bourke Decl. ¶ 11.  In order to appropriately evaluate an individual for home confinement, FMC Devens staff assesses the risk of criminal activity in the community and determines whether there is an appropriate home where the inmate can be placed. Bourke Decl. ¶ 12.  This is a time and resource intensive process.  *Id*.  Upon receipt of the staff

16

assessment, the BOP reviews the assessment and makes the final determination regarding home confinement. *Id.* If approved, absent any disciplinary infractions, the inmate would serve the remainder of his or her sentence on home confinement. *Id.*

Under 34 U.S.C. § 60541, the BOP may release some or all eligible elderly offenders and eligible terminally ill offenders from BOP facilities to home detention, upon written request from either BOP staff, or an eligible elderly offender[8] or eligible terminally ill offender[9]. Bourke Decl. ¶ 13. In order to appropriately evaluate an elderly or terminally ill individual for home confinement, the BOP assesses the risk of criminal activity in the community and determines whether there is an appropriate home where the individual can be placed. Bourke Decl. ¶ 15. If approved, absent any disciplinary infractions, the inmate would serve the remainder of his or her sentence on home confinement. Bourke Decl. ¶ 16. Inmates that do not meet the criteria for the

---

[8] The statute defines "eligible elderly offender" to include an inmate who is not less than 60 years of age; who is serving a term of imprisonment that is not life imprisonment based on a conviction for an offense or offenses that do not include any crime of violence; has served two-thirds of the term of imprisonment to which the offender was sentenced; who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense referenced in the statute; who has not been determined by BOP to have a history of violence, or of engaging in conduct constituting a sex offense or other excluded offense; who has not escaped, or attempted to escape from a BOP institution; whose release to home detention will result in a substantial net reduction of costs to the Federal Government; and who has been determined by BOP to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention. Bourke Decl. ¶ 13; *see also* 34 U.S.C. § 60541.

[9] "Eligible terminally ill offender" is defined as an offender in the custody of BOP who meets all of the above-stated criteria except the age restriction, and has been determined by a medical doctor approved by BOP to be in need of care at a nursing home, intermediate care facility, or assisted living facility, or diagnosed with a terminal illness. Bourke Decl. ¶ 14; *see also* 34 U.S.C. § 60541.

elderly home confinement can be placed on home confinement under BOP's general authority to do so, 18 U.S.C. § 3624(c)(2).  Bourke Decl. ¶ 18.

Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement."  Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020).  On April 3, 2020, the Attorney General made that finding and authorized the Director of BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates where COVID-19 is materially affecting operations.  Exhibit D at 1; Bourke Decl. ¶ 20.  In light of the COVID-19 pandemic, BOP is maximizing its authority to place inmates on home confinement and is expediting the process as much as possible in furtherance of the Attorney General's memorandum dated March 26, 2020, and April 3, 2020.  Bourke Decl. ¶ 19.

Pursuant to the Attorney's General's direction, FMC Devens receives rosters of inmates to be considered for home confinement.  Bourke Decl. ¶ 21.  The factors to be considered when reviewing and referring inmates for home confinement are: primary or prior offense is not violent; primary or prior offense is not a sex offense; primary or prior offense is not terrorism; no detainer for the inmate; the inmate's Mental Health Care Level is less than CARE-MH 4; the inmate's recidivism risk score is Minimum; the inmate has had no incident reports in the past 12 months (regardless of severity level); the inmate is a U.S. citizen; the inmate has a BRAVO score (custody classification) of Low or Minimum; the inmate has served 50% of their sentence; and the inmate has a viable release plan.  *Id*.  As a result of FMC Devens' higher population of inmates convicted of sex offenses, many FMC Devens inmates are ineligible for home confinement.  *Id*.  As part of

this review, not only does Unit Team review each inmate, a review is conducted by the Special Investigative Services Department ("SIS") and the Medical Department ("Medical"). *Id.* SIS determines if the inmate has engaged in violent or gang-related activity in prison. *Id.* Medical conducts multiple reviews. *Id.* Initially, Medical must determine the age and vulnerability of the inmate related to COVID-19 risk factors in accordance with CDC and prevention guidelines. *Id.* Additionally, Medical reviews the conditions under which the inmate would be confined upon release to determine whether those conditions would present a lower risk of contracting COVID-19 than the inmate would face at the BOP facility, and also determines whether frequent and on-going medical care is required within the next 90 days. *Id.*

To date eight (8) inmates at FMC Devens have been approved for transfers to home confinement. Bourke Decl. ¶ 22. The inmates receiving transfers must quarantine for fourteen days prior to transfer. *Id.* Two of the eight approved transfers have dates for transfer into home confinement for the week of April 27, 2020. *Id.* Eight additional inmates were previously referred by FMC Devens Warden to the Regional Residential Reentry Manager and are being vetted for approval and placement dates. *Id.* An additional ten inmates are in the final stage of review at FMC Devens and are soon to be sent to the Regional Residential Reentry Manager for consideration as well. *Id.* To date, 118 inmates have been reviewed under the expanded criteria for home confinement placement and 91 have been denied home confinement because they fail to meet the required criteria. *Id.*

1.   Petitioners' Eligibility for Home Confinement

Petitioner Gordon is currently serving a 15-year sentence with a Projected Release Date from BOP custody on August 18, 2027. Bourke Decl. ¶ 24. He has served approximately 5 years and 5 months, which equates to only 36.6% of his term of imprisonment. *Id.* Under the established

criteria mentioned above, he is ineligible for consideration for home confinement under the expanded home confinement reviews.  *Id.*  His home detention eligibility date remains at February 18, 2027.  *Id.*

Petitioner Grinis was previously reviewed and has a Residential Reentry Center Home Confinement date of May 21, 2020.  Bourke Decl. ¶ 23.  This is his first eligibility date for home detention based on his 9-month sentence, with his Projected Release Date from BOP custody on June 16, 2020.  *Id.*  Subsequent to the updated reviews for extended home confinement consideration, Grinis was reviewed again by Unit Team, SIS and Medical.  *Id.*  Medical determined that Grinis fit the criteria for being at high risk for COVID-19, and he cleared review by Unit Team and SIS.  *Id.*  Unit Team was notified to reach out to the Regional Residential Reentry Manager ("RRM") to determine whether an earlier release date could be obtained, since he was already approved for a May 21, 2020 release.  *Id.*  At this time, Grinis' revised home confinement date is May 5, 2020.  *Id.*

Petitioner Soliz is currently serving a 20-year (240-month) sentence with a Projected Release Date from BOP custody on September 13, 2033.  Bourke Decl. ¶ 25.  He has served approximately 4 years and 10 days, which equates to only 20.1% of his term of imprisonment.  *Id.*  Additionally, Soliz is not a candidate for extended home confinement because his recidivism risk score is too high.  *Id.*  Soliz fails to meet the required "Minimum" risk score.  *Id.*  Furthermore, Soliz currently has a detainer filed by the State of Texas for a Parole Violation Warrant filed on February 2, 2017.  *Id.*  Under the established criteria mentioned above, he is ineligible for consideration under the expanded home confinement reviews.  *Id.*

**ARGUMENT**

I.     **PETITIONERS ARE NOT ENTITLED TO HABEAS RELIEF**

    A.     <u>Habeas Relief Is Unavailable To Challenge Conditions Of Confinement</u>

The gravamen of the Petition is that Petitioners are entitled to habeas relief pursuant to 28 U.S.C. § 2241 based on Respondents' alleged denial to Petitioners, and putative class members, of the "ability to engage in social distancing," and their "failure to use their authority" to order compassionate release and/or transfer to home confinement. ECF No. 1 at ¶¶ 121-122. Petitioners allege that their prison conditions pose an unreasonable risk of serious harm to their health, and they accuse Respondents of acting with deliberate indifference to those needs. *Id.* at ¶¶ 116-122. Petitioners' conditions of confinement claims are not properly brought by the Petition, and they should be denied.

The traditional meaning and purpose of habeas relief is to effect release from illegal custody. *Johnson v. Moran,* 812 F.2d 23, 24 (1st Cir. 1987) (citing *Preiser v. Rodriguez,* 411 U.S. 475, 486 n.7 (1973)). "As a general matter, a petition for habeas corpus is the appropriate means to challenge the fact or duration of incarceration, while challenges to the conditions of confinement are generally brought as civil rights claims under *Bivens.*" *Graham v. Sabol*, 734 F.Supp.2d 194, 204 (D. Mass. 2010) (citing *Sanchez v. Sabol*, 539 F.Supp.2d 455, 459 (D. Mass. 2008); *Kane v. Winn*, 319 F.Supp.2d 162, 213 (D. Mass. 2004); *Kamara v. Farquharson*, 2 F.Supp.2d 81, 89 (D. Mass. 1998)); *see also Sperling v. Grondolsky,* No. 17-12075-PBS, 2018 WL 1904177, at *2 (D. Mass. Apr. 20, 2018) (typically a *Bivens* action is the appropriate means for a federal prisoner to challenge the adequacy of his medical treatment). Indeed, as this Court has found, "judges of this Court repeatedly have held that the failure to provide adequate medical treatment is not the proper subject of a petition for a writ of habeas corpus." *Crooker v. Grondolsky*, No. 12-12106-GAO,

2013 WL 101588, at *2 (D. Mass. Jan. 4, 2013); s*ee also Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (constitutional claims challenging confinement conditions fall outside of the core of habeas relief).

Because a petition for writ of habeas corpus is not the proper means by which to bring Petitioners' Eighth Amendment claims, this Court lacks jurisdiction to order habeas relief for Petitioners, and the Petition should be dismissed.  *Warner v. Spaulding,* Civil Action No. 18-cv-10850-DLC, 2018 WL 9838349, at *1 (D. Mass. Sept. 24, 2018) (dismissing petition, citing *Muhammad v. Close,* 540 U.S. 749, 750 (2004) (per curiam) (request for relief turning on circumstances of confinement may be presented in a non-habeas action)); *see also McLaughlin v. MacDonald,* Civil Action No. 11-11587-JLT, 2012 WL 4058063, at *5 (D. Mass. Aug. 22, 2012) (dismissing claims alleging inadequate medical treatment brought as habeas action); *Kamara*, 2 F.Supp.2d at 89 (dismissing petition, finding that a challenge to conditions of confinement on grounds of inadequate medical treatment should have been brought as a civil rights action); *Bedford v. Wall,* No. C.A.04-527L, 2005 WL 775904, at *2 (D. R.I. Mar. 31, 2005) (court may consider only unlawful custody claims raised by petition).

Accordingly, Respondents request that this Court deny the Petition, and dismiss it in its entirety.

B.     The PLRA Precludes The Relief That Petitioners Seek

In addition to improperly bringing a Petition for redress of their Eighth Amendment claims, Petitioners also improperly seek release of hundreds of inmates from FMC Devens as a remedy.  However, the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626, places strict limits on a court's ability to order the release of inmates "in any civil action in Federal court with respect to prison conditions…" and, in fact, precludes a single district judge from doing so

as Petitioners request.   18 U.S.C. § 3626(a)(3)(B); *see also Vaqueria Tres Monjitas, Inc. v. Comas,* 980 F.Supp.2d 65, 117 n.33 (D. Puerto Rico Sept. 23, 2013) (the PLRA's authority to release prisoners to cure a "systemic violation of the Eighth Amendment" is reserved to a three-judge district court).

The PLRA applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]"   18 U.S.C. § 3626(g)(2).   In such a suit, the court "may enter a temporary restraining order or an order for preliminary injunctive relief," but such injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."   18 U.S.C. § 3626(a)(2).   Under the PLRA, a "prisoner release order" – which "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison," 18 U.S.C. § 3626(g)(4) – may "be entered only by a three-judge court," 18 U.S.C. § 3626(a)(3)(B), and then only if certain conditions have been met.   Among other requirements, "no court shall enter a prisoner release order unless – (i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders."   18 U.S.C. § 3626(a)(3)(A)(i)(ii).   *See, generally, Brown v. Plata,* 563 U.S. 493 511-512 (2011) (setting forth the requirements of the PLRA, and holding that only a three-judge court may enter an order limiting prison population after finding by clear and convincing evidence that crowding

is the primary cause of the constitutional violation, and only after a district court has first entered an order for less intrusive relief).

Congress enacted "the PLRA in an effort, in part, to oust the federal judiciary from day-to-day prison management." *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997) (citations omitted); *see also Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (en banc) (Calabresi, J., concurring) ("The in banc majority argues at length that Congress meant to get the federal courts out of the business of running jails, and it cites any number of congressional statements to that effect. I agree."); *Denike v. Fauver,* 3 F.Supp.2d 540, 542 (D. New Jersey May 4, 1998) (purpose of PLRA is to reduce federal judicial involvement in prison administration). "Congress intended the PLRA to revive the hands-off doctrine," which was "a rule of judicial quiescence derived from federalism and separation of powers concerns." *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 991, 997 (9th Cir. 2000). "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown*, 563 U.S. at 511 (2011). Section 3626 thus "restrict[s] the equity jurisdiction of federal courts," *Gilmore*, 220 F.3d at 999, and, "[b]y its terms . . . restricts the circumstances in which a court may enter an order 'that has the purpose or effect of reducing or limiting the prison population.'" *Plata*, 563 U.S. at 511 (quoting 18 U.S.C. § 3626(g)(4)). The PLRA's "requirements ensure that the 'last remedy' of a population limit is not imposed 'as a first step.'" *Id.* at 514 (quoting *Inmates of Occoquan v. Barry*, 844 F.2d 828, 843 (D.C. Cir. 1988)). "The release of prisoners in large numbers . . . is a matter of undoubted, grave concern." *Id.* at 501.

Here, not only does the PLRA preclude the relief that Petitioners seek, but even if this

24

Court were inclined to grant such relief, their request is premature.  From the outset, Petitioners seek release from this Court, contrary to the requirements of the PLRA that any such relief must be granted by a three-judge panel.  Next, they seek release without this Court haven't entered any other less intrusive order.  On these grounds alone, the Petition must be denied.

In *Money v. Pritzker*, ___ F. Supp. 3d ___, Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), inmates from various Illinois Department of Correction facilities brought purported class action lawsuits seeking release of over 12,000 prisoners in light of the COVID-19 pandemic.  The Court held that the PLRA prevented it from entering the relief requested by petitioners for the release of inmates.  *Id.* at * 14.  Similarly, in the very recent case of *Plata v. Newson,* No. 4:01-cv-01351-JST (N.D. Calif. Apr. 17, 2020), plaintiffs sought an order requiring inmate releases or transfer of inmates in light of the COVID-19 pandemic.  There, the court found that the measures defendants had taken to prevent the spread of the coronavirus, did not constitute an Eighth Amendment violation.  *Id*. at 15.  The court further held that, pursuant to the PLRA, the court lacked authority to grant the release or transfer, finding that a "prisoner release order" could only be granted by a three-judge court.  *Id*., citing 18 U.S.C. § 3626(a)(3)(B).

Here, there can be no dispute that Petitioners' lawsuit is a "civil action with respect to prison conditions" governed by the PLRA.  18 U.S.C. § 3626(g)(2).  The PLRA defines "civil action with respect to prison conditions" broadly to mean "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but [that term] does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]"  *Id.*  Petitioners seek release as a remedy for allegedly unconstitutional conditions at FMC Devens —for themselves and for the putative class members.  As set forth above, the PLRA strictly limits the relief that

this Court may grant and precludes the Court from releasing inmates from FMC Devens as Petitioners request.  18 U.S.C. § 3626(a)(3)(B). Accordingly, this Court must deny the Petition.

      C.    <u>Respondents Are Not Deliberately Indifferent To Petitioners' Medical Needs</u>

      1.    <u>Standard</u>

Petitioners allege that the conditions of confinement at FMC Devens constitute a violation of the Eighth Amendment.  The Eighth Amendment protects against the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII. "[A] prison official violates the Eighth Amendment only when two requirements are met."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "[T]o prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (citing *Estelle*, 429 U.S. at 106; *Sires v. Berman*, 834 F.2d 9, 12 (1st Cir. 1987)).

The objective standard evaluates the seriousness of the risk of harm to health. There must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'" *Farmer*, 511 U.S. 825, 843(1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).  A medical need is "serious" if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention.  *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir.2011); *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir.1990), cert. denied, 500 U.S. 956 (1991)).

To satisfy the subjective prong and show deliberate indifference, which has been described as a "culpable state of mind," *Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015), and "a narrow band of conduct," *Kosilek*, 774 F.3d at 83 (citation omitted), a prisoner must generally produce

"evidence that the absence or inadequacy of treatment is intentional," *Perry*, 782 F.3d at 79 (citing *Estelle*, 429 U.S. at 105; *Watson v. Caton*, 984 F.3d 537, 540 (1st Cir. 1993)).  Or, "deliberate indifference may…be exhibited by a wanton disregard [of] a prisoner's needs, [when] such disregard [is] akin to criminal recklessness, requiring consciousness of impending harm, easily preventable."  *Kosilek*, 774 F.3d at 83 (quoting *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011); *Watson*, 984 F.2d at 540) (internal quotation marks omitted).  In any event, a plaintiff must prove more than "an inadvertent failure to provide adequate medical care," *Estelle*, 429 U.S. at 105, or a mere "disagreement[ ] between [himself] and [his] doctors about the proper course of [his] medical treatment," *Kosilek*, 774 F.3d at 83 (quoting *Watson*, 984 F.2d at 540).  Regarding the latter, it is well-established that the Eighth Amendment "does not impose upon prison administrators a duty to provide care…of the prisoner's choosing."  *Id.* at 82 (citing *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir. 1980)).  Deliberate indifference to serious medical needs means "a prison official subjectively must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Lopes v. Riendeau*, 177 F.Supp.3d 634, 657 (D. Mass. 2016) (quoting *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007); *Farmer*, 511 U.S. at 837) (internal quotations omitted)); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556 (1st Cir. 1988).

This Court will assess FMC Devens' actions in light of Petitioners' constitutional claims, but it must not substitute its judgment for that of the BOP.  "[I]t is not the district court's own belief about medical necessity that controls, but what was known and understood by prison officials in crafting their policy."  *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  As such, although this Court cannot abdicate its responsibility to ensure that the limits imposed by the Constitution are not ignored, the court does not "sit to substitute its own judgment for that of prison

administrators." *Id.* at 92.

Not only does the Petition fail to identify that a substantial risk of serious harm to Petitioners exists, Petitioners are unable to demonstrate that Respondents have acted with deliberate indifference to Petitioners' medical needs. While prison administrators do not have unlimited authority over prisoners, and their actions are subject to judicial checks, such checks are limited: "their actions cannot be entirely arbitrary and capricious." *Nadeau v. Helgemoe*, 561 F.2d 411, 419 (1st Cir. 1977). As long as the prison policy or actions are made in good faith, do not constitute "deliberate indifference," or do not go beyond "reasonable professional limits," such policies or actions do not violate the Eighth Amendment. *Battista v. Clarke*, 645 F.3d 449, 454 (1st Cir. 2011) (citing *Farmer*, 511 U.S. at 844-45; *Youngberg v. Romeo*, 457 U.S. 307, 321, 324-25 (1st Cir. 2011) (internal quotations omitted)); *but see Cameron v. Tomes*, 990 F.2d 14, 20 (1st Cir. 1993) (professional judgment as to issues involving conditions of confinement creates only a "presumption" of correctness). Such is the case here.

### 2.    Petitioners Cannot Establish Substantial Risk of Harm

Petitioners cannot establish that they have suffered a "sufficiently serious" deprivation. *See Wilson*, 501 U.S. at 297. To be sure, the spread of COVID-19 within the United States puts everyone at some degree of risk of getting sick, but the BOP has taken appropriate steps to mitigate those risks throughout its inmate population,[10] including with respect to the inmate population at

---

[10] Courts around the country have recently received challenges to detention on the grounds of COVID-19 in the criminal bail context and have recognized the government's public health efforts, particularly the efforts of the Bureau of Prisons, to address the COVID-19 crisis. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020); *United States v. Gileno*, No. 3:19-cr-161, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020); *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *United States v. Jefferson*, No. CCB 19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020); *United States, v. Rollins*, Nos. 19-CR-34S, 11-CR-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) (denying motion for release from custody pending sentencing and explaining that "[a]s

FMC Devens.  As set forth above, those measures include providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.  Additionally, FMC Devens implemented the "modified operations" directive in a number of ways to reduce the spread of COVID-19 among inmates, including: (1) "grab and go" meals for inmates, meaning that inmates are permitted to pick up pre-packaged meals at designated times, but return to their housing units in order to eat; (2) providing health services within units, and allowing only inmates from the same units, who are sheltering in place together, to be in the same area for medical visits; and (3) inmates are all provided masks and are required to wear them, or be subject to discipline, and extensive cleaning and sanitizing measures are taking place within FMC Devens.

Although Petitioners' argue that they live in units in close proximity to other prisoners, they fail to recognize that this situation is also true of many unincarcerated members of the community who live with roommates or family members. *See Hines v. Youssef*, No. 1:13-cv-00357-AWI-JL, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk society would not tolerate.").  At FMC Devens, each unit is essentially a closed family unit and the BOP separates each unit from other units, visitors, and sick inmates.  BOP staff also wear masks and/or PPE and give inmates masks to wear.  During

---

serious as it is, the outbreak of COVID-19 simply does not override the statutory detention provisions above"); *United States v. Passley,* 2020 WL 1815834, at *4 (E.D.N.Y. Apr. 9, 2020) (balancing defendant's risk of flight and health concerns and concluding COVID-19 is not a sufficiently compelling circumstance to justify release); *Mell v. United States,* No. 3:20-cv-2277 (BRM), 2020 WL 1852384, at *1 (D. New Jersey Apr. 13, 2020).

movement, inmates are able to, and are encourage to, maintain social distancing while in line.  And while Petitioners reiterate that they are unable to effectively maintain social distancing in contravention of CDC guidance, although six-foot distancing would "ideally" be followed, the guidance acknowledges that complete social distancing may not be feasible in jail.  *Mays v. Dart*, ___ F.Supp.3d ___, 2010 WL 1812381, at *10 (N.D. Ill. Apr. 9, 2020).

For these reasons, Petitioners have failed to establish that they are subject to an unreasonable risk of harm, and their constitutional claims must fail.

> 3.   The BOP Has Taken Appropriate Measures To Protect The Health Of Inmates At FMC Devens

Petitioners likewise cannot satisfy the subjective element of the constitutional analysis, which requires them to prove Respondents' "culpable state of mind," *Perry*, 782 F.3d at 78, and to produce "evidence that the absence or inadequacy of treatment is intentional," *Perry*, 782 F.3d at 79 (citing *Estelle*, 429 U.SW. at 105; *Watson v. Caton*, 984 F.3d 537, 540 (1st Cir. 1993)); *see also Farmer*, 511 U.S at 837.

"To the contrary, the Bureau of Prison is by all objective accounts responding to the COVID-19 pandemic as any reasonable observer could expect under the circumstances to prevent infectious outbreak, protect inmate health, and preserve internal order – all legitimate government aims." *United States v. Villegas,* 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020) (slip op).  The condition complained of here is not the existence of COVID-19, which is not under the control of the BOP, or of FMC Devens.  Rather, the condition complained of is the precautions FMC Devens has taken to reduce exposure to or the spread of COVID-19.  FMC Devens is acutely aware of the risk that COVID-19 poses to its inmate population and to the public at large, and Respondents can hardly be said to be indifferent, as shown by their actions as set forth above.  *See* Exhibits A, B.

Earlier this month, when Seattle, Washington was the epicenter of the COVID-19 outbreak, the court noted that "Plaintiffs do not cite to authority, and the court is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak — even one as serious as COVID-19." *Dawson v. Asher*, No. C20-0409 JRL-MAT, 2020 WL 1304557, at *2 (W.D. Wash March 19, 2020). Similarly, Petitioners cannot establish that the precautions and care at FMC Devens are "sure or very likely" to lead to exposure or that that Respondents have been deliberately indifferent. The district court in *Money*, 2020 WL 1820660, reached the same conclusion on similar facts. After finding that prison officials came forward "with a lengthy list of the actions they have taken to protect…inmates," *id.* at *18, the court recognized that prison officials in that case (like FMC Devens staff here) "are trying, very hard, to protect inmates against the virus and to treat those who have contracted it." *Id.* There is no evidence to "support any suggestion that [prison officials] have turned a kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare." *Id.* (quoting *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012)). This Court should also find that Respondents' actions "easily pass constitutional muster." *Id.*

Similarly, in *United States v. Desage*, No. 2:13-cr-00039-JAD-VCF, 2020 WL 1904584, at *3 (D. Nev. Apr. 17, 2020), defendant alleged that the BOP's COVID-19 protections for inmates were insufficient, and that he was at risk of being exposed to the life-threatening virus. In denying his release, the court found such claims to be "hyperbole," and found that the information the government provided about its plan, procedures and practices in general, and for the defendant in particular, demonstrated a lack of deliberate indifference, and denied defendant's emergency motion for compassionate release. *Id.* In reviewing Petitioners claims, and considering the actions

that Respondents have taken to combat COVID-19 and to keep inmates and staff alike from contracting coronavirus, this Court should also find that Petitioners have failed to demonstrate deliberate indifference, and that Respondents' actions, in fact, demonstrate a lack of deliberate indifference.

More importantly, the BOP has not been deliberately indifferent to the COVID-19 outbreak, but is taking aggressive measures to combat its spread and care for inmate who contract the disease.  While Petitioners may ultimately disagree with the measures taken by the BOP to protect and treat inmate health and safety while also carrying out its mission to effectuate criminal sentences imposed by federal courts, deliberate indifference is not shown simply by a difference of medical judgment.  *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (holding that a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation").  "[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).  Indeed, a prisoner must prove more than "an inadvertent failure to provide adequate medical care," *Estelle*, 429 U.S. at 105, or a mere "disagreement[ ] between [himself] and [his] doctors about the proper course of [his] medical treatment," *Kosilek*, 774 F.3d at 83 (quoting *Watson*, 984 F.2d at 540).  Regarding the latter, it is well established that the Eighth Amendment "does not impose upon prison administrators a duty to provide care ... of the prisoner's choosing." *Id*. at 82 (citing *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir. 1980)).

In the midst of this extraordinary emergency, "[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." *Jacobson v. Comm. of Massachusetts*, 197 U.S. 11, 30 (1905).  Rather,

public health officials are entitled to heightened deference when exercising science-based public health judgment during a public health emergency. *See, e.g.*, *United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 791 (E.D.N.Y. 1963) (explaining in a habeas matter that "the judgment required is that of a public health officer and not of a lawyer used to insist on positive evidence to support action; their task is to measure risk to the public.  They deal in a terrible context and the consequences of mistaken indulgence can be irretrievably tragic."); *Hickox v. Christie*, 205 F. Supp. 3d 579, 594 (D.N.J. 2016) ("To permit these constitutional claims to go forward…would be a judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not [the court's]) expertise."); *see also Jacobson,* 197 U.S. at 31 (upholding mandatory vaccination law and explaining that such a measure, enacted to protect public health, will not be struck down unless it "has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights…" secured by the Constitution); *Bragdon v. Abbot*, 524 U.S. 624, 650 (1998) (noting that "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) (recognizing that "courts normally should defer to the reasonable medical judgments of public health officials").

For the reasons set forth above, it is beyond the purview of this Court to second-guess BOP officials' judgment, and the medical judgments made within the BOP, or for this Court to delve within the daily operation of the BOP.  In light of all of the measure taken by the BOP, and by FMC Devens, Petitioners' claims fail to state an Eighth Amendment claim of deliberate indifference to Petitioners' medical needs.  Without an adequate constitutional violation supported by the pleadings, Petitioners' claims cannot withstand judgment.  Thus, this Court should deny the Petition, and dismiss Petitioners' claims in their entirety.

## II.   PETITIONERS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER OR ANY INJUNCTIVE RELIEF

### A.   Standard

Preliminary injunctive relief, whether sought through a TRO or a request for preliminary injunction, "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Preliminary injunctions are designed to preserve the relative positions of the parties until a determination of the merits can be reached.  *See Verhoeven v. Brunswick School Committee*, 207 F.3d 1, 3 (1st Cir. 1999).

The burden of proof requires the moving party to demonstrate that:  (1) he has a substantial likelihood of success on the merits of his claims; (2) that he will suffer irreparable harm unless the injunction issues; (3) that his harm outweighs any damage to the opposing party; and (4) that the injunction would not be adverse to the public's interest.  *See Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981).  The Supreme Court requires the moving party to demonstrate that the irreparable harm is likely – not t just possible – before a preliminary injunction may issue.  *Winter*, 555 U.S. at 22.

In order to receive a preliminary injunction, Petitioners must demonstrate likely success on the merits of their case.  *See Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).   If they cannot do so, "the remaining factors 'become matters of idle curiosity,'…insufficient to carry the weight of this extraordinary relief on their own." *Chambers v. NH Prison*, 562 F. Supp. 2d 197, 199 (D. N.H. 2007) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996)).  Importantly, even if this Court finds that Petitioners are likely to succeed on the merits of their claims, "unless [Petitioners] also demonstrate[] [they] will suffer irreparable harm without the requested relief," a preliminary

injunction will not issue. *Id.* (referencing *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19).  The two – likelihood of success and irreparable harm – must "must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19.

      B.      <u>Petitioners Are Unlikely To Succeed On The Merits Of Their Claims</u>

Initially, Respondents note that, as discussed above, Petitioners cannot establish a violation of the Eighth Amendment and are, therefore, unlikely to succeed on the merits.   Moreover, Petitioners are further unlikely to succeed on the merits because: (1) the conditions in FMC Devens are not as they are portrayed in the Petition; (2) release is unlikely to redress the alleged harm; (3) Petitioners are not entitled to relief that would divest BOP of its discretion to release inmates in appropriate circumstances, and; (4) Petitioners are not entitled to unilaterally truncate judicially-imposed sentences, which can only be modified by the sentencing court.

      1.      <u>Petitioners' Allegations Regarding The Conditions At FMC Devens Are Inaccurate</u>

Petitioners portray the conditions at FMC Devens as particularly dire and that FMC Devens is incapable of preventing the spread of COVID-19.   This is simply not an accurate description of the conditions at FMC Devens.  As set forth above, in addition to the steps taken at the national level, FMC Devens has also taken a number of additional measures in response to the COVID-19 pandemic, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures to include: (a) educating inmates and staff regarding the virus and the BOP's response, and on measures that they should take to stay healthy; (b) establishing quarantine and isolation units that are physically separated from the housing units; (c) providing separate examination rooms and testing for symptomatic inmates; (d) enhancing screening of staff and

visitors to FMC Devens; (e) reducing and/or prohibiting prisoner movement; (f) distributing

personal protective equipment and sanitizer to staff and inmates, and requiring that masks be worn

in FMC Devens; (f) separating inmates by housing unit and floor to shelter in place with the fewest

number of inmates; (g) modifying activities and services to provide them in the housing unit, with

the fewest number of inmates; and (h) developing extensive cleaning and disinfecting procedures

at FMC Devens.

Clearly, BOP is doing its level best to protect inmates against COVID-19 and is prepared

to treat those who have contracted it, contrary to the allegations set forth in the Petition.  As such,

Petitioners are unlikely to succeed on the merits of their claims.

2.     Release Is Unlikely To Redress The Alleged Harm

The primary relief that Petitioners seek from the BOP – release from custody of a hundreds

of FMC Devens inmates (including themselves) – is unlikely to redress the alleged, potential harm

that they or the members of the alleged class purportedly suffer:  risk of contracting COVID-19.

To bring a claim in federal court, a plaintiff must satisfy the requirements for Article III standing:

injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The

redressability requirement limits Article III jurisdiction to those cases in which the relief sought

will remedy the injury alleged.  *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529

U.S. 765, 771 (2000).  Although certainty is not required, "the [plaintiff] must demonstrate 'that it

is likely as opposed to merely speculative that the injury will be redressed by a favorable decision

of the court.'"  *Spectrum Five LLC v. FCC*, 758 F.3d 254, 260 (D.C. Cir. 2014) (citation omitted).

A plaintiff must demonstrate standing (including the redressability element) for each form of relief

sought.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  "[I]f a favorable judicial

decision is unlikely to correct the alleged wrong, there is no case or controversy within the meaning of Article III." *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 566 (D.D.C. 2018).

Here, Petitioners' claims again fail, and they cannot demonstrate a likelihood of success on the merits. Even if this Court had jurisdiction to order the release of prisoners, which it does not, Petitioners cannot show that the immediate release of a substantial number of FMC Devens inmates will actually lessen their risk of contracting COVID-19. It cannot be denied that COVID-19 is spreading throughout the nation generally, and specifically within the Commonwealth of Massachusetts. However, not one inmate at FMC Devens has contracted COVID-19. As noted, BOP has taken extensive measures to protect the staff and inmates at FMC Devens, including the ability to come and go from the facility, screening new arrivals for symptoms, taking measures to allow greater social distancing during meals and in groups, and isolating anyone showing symptoms of COVID-19. Unlike many in the community, inmates at FMC Devens do not need to leave the facility to purchase groceries, toiletries, or cleaning supplies. By contrast, Petitioners have not provided any assurances that the places where released inmates would reside, or the lifestyles they would have to maintain upon release, would offer similar protections. For example, while Petitioners complain that they are required to share a living space with a limited number of other inmates, it is not clear that they would not be subject to the same arrangement outside the facility. It is not even clear that all inmates that Petitioners request be released even have a home to go to or the financial resources to provide for themselves; it is likely many would be homeless and without means to support themselves if released as Petitioners request. In such a situation, the risk of contracting COVID-19 is certainly and dramatically increased, and not reduced, if inmates are released from FMC Devens in the middle of a pandemic with no viable means to obtain food, shelter and medical care.

Under these considerations, Petitioners cannot demonstrate that redress of the alleged harm – contracting coronavirus – is viable; and as such, cannot demonstrate a likelihood of success on the merits of their claims.

3.    <u>Petitioners Are Not Entitled To Divest BOP Of Its Discretion To Place Inmates In Home Confinement In Appropriate Circumstances Or To Have The Court Amend Inmates' Criminal Sentences</u>

Petitioners improperly asks this Court to release inmates from FMC Devens in order to reduce the prison population and to allow for effective social distancing. Unlike the relief that Petitioners seek, there are specific legal avenues for the release or transfer of post-conviction inmates. Those avenues include home confinement and/or compassionate release. Petitioners are not likely to succeed on the merits of their argument that this Court can release inmates from their incarceration by allowing their Petition or request for injunctive relief.

Regarding home confinement, the BOP may place a prisoner in home confinement only for the shorter of 10 percent of the term of imprisonment or 6 months. 18 U.S.C. § 3624(c)(2). Under the CARES Act, signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020). On April 3, 2020, the Attorney General made that finding and authorized the Director of BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FMC Devens.

Notably, the determination of whether to place a prisoner in home confinement falls solely within the discretion of the BOP and is "not reviewable by any court." 18 U.S.C. § 3621(b). In deciding whether to place a prisoner in home confinement, the BOP will consider: the inmate's

age and vulnerability to COVID-19 per CDC guidelines, the inmate's conduct in prison including violence and gang activity, the inmate's recidivism risk, the inmate's reentry plan, the inmate's danger to the community.  Some offenses, such as sex offenses, will render an inmate ineligible for home confinement.  *Id*.  As a result of FMC Devens' higher population of inmates convicted of sex offenses, many FMC Devens inmates are ineligible for home confinement. *Id*.  Notably, of the three named Petitioners in this case, only Grinis is eligible for home confinement, and has a home confinement date of May 5, 2020.  Bourke Decl. ¶ 23.

Regarding compassionate release, neither BOP nor this Court has the authority to provide inmates with "early release."  A reduction of an inmate's federal sentence can only be accomplished by an Article III judge, and specifically, the inmate's sentencing judge.  However, upon an inmate's request, the Director of BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A).  This process is outlined in the U.S. Dep't of Justice Fed. Bureau of Prisons, *Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Program Statement 5050 (Jan. 17, 2019).  Although the BOP is processing these requests as expeditiously as possible, the statute provides the BOP thirty (30) days to evaluate compassionate release requests before any motion may be presented in the sentencing court. 18 U.S.C. § 3582(c)(1)(A).  And, the ultimate decision on compassionate release lies with the sentencing judge.  *Id.*

In this case, each of the three named Petitioners was reviewed for a Reduction In Sentence. Bourke Decl. ¶ 7.  All of their requests were denied because of failure to meet the established criteria.  Id. ¶¶ 7-9.  Instead, Petitioners essentially seek to divest the BOP of its statutory and regulatory discretion as to which inmates should be placed in home confinement, and to divest

sentencing judges of their ability (within the requirements of law) to determine the sentence of individuals convicted in their courts. Petitioners should not be granted such sweeping and unprecedented relief when existing administrative and statutory proceedings are available to grant them the relief that they seek, if appropriate, or to circumvent the decisions made on the merits of their requests.

For these reasons, Petitioners have not shown that they are likely to succeed on the merits of their claim.

C.     Petitioners Fail To Establish Imminent Irreparable Harm

Petitioners cannot show irreparable harm such that an injunction or TRO should issue. To the contrary, as discussed above, the BOP has taken significant steps to ensure the health and safety of inmates, and the minimization of risk of exposure to all inmates and staff. The BOP also has instituted necessary precautions and procedures to ensure that any inmates who become ill will be well-cared for.

Here, Petitioners allege merely the possibility of contracting COVID-19 as the basis for the injunctive relief they seek from this Court. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "A showing of irreparable harm requires an actual, viable, presently existing threat of serious harm that cannot adequately be remedied through money damages alone." *Corporate Technologies, Inc. v. Harnett*, 943 F.Supp.2d 233, 242 (D. Mass. 2013) (case citations omitted).

Accordingly, Petitioners claims once again fail. As discussed above, Petitioners fail to take into account the myriad protections which have been put in place to prevent the introduction and

spread of infection within FMC Devens, and to reduce the risk that persons with COVID-19 enter FMC Devens in the first place. Moreover, Petitioners fail to address in any meaningful way how, if released, they will be safer from the risk of infection or have access to adequate care if infected. Every person in the United States, whether in a prison or not, faces the risk of COVID-19 exposure. *See United States v. Steward*, No. S1:20-cr-0052 (DCL), 2020 WL 1468005, at * 1(S.D.N.Y. Mar. 25, 2020) ("there is also no reason to find that the defendant's release would lessen the risk to his health presented by COVID-19); *United States v. Taylor*, No. 5:19-CR-192-KKC-MAS, 2020 WL 1501997, at *5 (E.D. Ky. Mar. 26, 2020) ("there is little reason to believe that [Petitioner] would be more at risk if detained versus being released"). Thus, Petitioners are far from showing irreparable harm in this case.

Further, Petitioners have alternative methods for relief available to them, other than seeking a temporary restraining order, to secure early release. *See, e.g.*, 18 U.S.C. § 3582 (compassionate release); 18 U.S.C. § 3624(c) (prerelease custody/home confinement). As such, Petitioners have not shown irreparable harm and the inability to show irreparable harm presents an independent basis for denying their requested emergency relief.

D.   Granting Petitioners' Requested Relief Would Cause Substantial Harm To Others

Petitioners demand a dramatic remedy that would have a profound effect on hundreds of inmates, as well as to the general public: the immediate release of a substantial portion of convicted inmates at FMC Devens. Petitioners do not allege that they have appropriate release plans, or that they would have a place to go, but even if they did, Petitioners provide no assurance that all of the released inmates have similar conditions, or that they will be able to provide for their own food and medical care needs, or to protect themselves any better against the spread of COVID-19. More importantly, Petitioners do not (and cannot) provide any assurance regarding the

hundreds of other inmates who would find themselves immediately released.  Indeed, it is quite likely that the sudden removal of so many inmates would leave some of them homeless and without access to food, shelter, or medical care in the midst of a grave pandemic that is having a substantial impact on the nation.  The public would be placed at risk by release of criminally convicted inmates, without a release plan or conditions of release.  Thus, Petitioners requested relief would cause substantial harm to themselves and others and therefore should be denied.

      E.    <u>Public Health And Safety Would Not Be Served By Granting The Requested Relief</u>

The public's interest is not served by short-circuiting the existing administrative and judicial processes that are designed to carefully weigh freeing the incarcerated and convicted individuals at issue from custody against the risk to public safety in doing so.  The risk of danger to the public in granting Petitioners relief and requiring the immediate release of hundreds of inmates who have been convicted and sentenced for a myriad of crimes, outweighs the alleged need for expediency here.  The BOP will make a determination as to which inmates are entitled to home confinement (*see, e.g.,* Attorney General's Memoranda, Exhibits C and D), or the other judicial avenues available to convicted prisoners.

Further, the government's interest in public safety extends to protecting the public from the risk of the spread of COVID-19 and recidivism by released inmates.  Indeed, the Attorney General makes clear that such release should be done in a manner that balances the safety considerations for all involved.  *See* Exhibits C, D.  The Attorney General recognizes that there is "an obligation to protect the public."  This means that BOP "cannot simply release prison populations *en masse* onto the streets."  Such a release "would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses."  *Id.*  Our over-burdened police and safety services should not be forced to

deal with the "indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they will have a safe place to go where they will not be mingling with their former criminal associates, and that they will not return to their former ways as soon as they walk through the prison gates."   These weighty considerations cannot be adequately addressed by the Court granting Petitioners' proposed relief of immediately releasing hundreds of inmates.   Clearly, Petitioners have not shown that the balance of hardships and public interest tips in their favor.

III.   **PETITIONERS HAVE NOT PROVIDED A SUFFICIENT BASIS FOR CLASS CERTIFICATION, AND CLASS-WIDE RELIEF WOULD LIKELY HARM MANY INMATES**

Petitioners purport to bring the action as a class action on behalf of themselves and "all current and future people in post-conviction custody at FMC Devens."   The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"   *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).   To certify a class under Fed. R. Civ. P. 23, a plaintiff must show that the proposed class satisfies all four requirements of Fed R. Civ. P. 23(a) and one of the three Fed. R. Civ. P. 23(b) requirements.   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).   As discussed below, class certification is inappropriate in this case; *see also Abla v. Brinker Rest. Corp.*, 279 F.R.D. 51, 55 (D. Mass. 2011) (quoting *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 341 (D. Mass. 2003)).

Petitioners fall short. They claim to satisfy the numerosity requirement only by lumping together "all current and future people in post-conviction custody at FMC Devens..."   For purposes of this filing only, the BOP does not challenge the numerosity requirement under Rule 23(a).   So construed, however, the class cannot satisfy the remaining elements.

43

A class action may not be certified unless "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  This means Petitioners are required "to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350.  The Supreme Court has cautioned that the language of Rule 23(a)(2) "is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.''" *Id.* at 349 (citations omitted).  The "claims must depend upon a common contention … of such a nature that it is capable of classwide resolution." *Id.* at 350.  Determination of whether the contention is true or false must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *see also id.* at 352 (requiring "some glue holding the alleged *reasons* for all those [challenged] decisions together").

In *Money*, 2020 WL 1820660, the district court denied class action certification in identical circumstances to the case *sub judice*.  The district court explained that public interest "mandates individualized consideration of any inmate's suitability for release and on what conditions, for the safety of the inmate, the inmate's family, and the public at large. *Id.* at *14.  This is because "[e]ach putative class member comes with a unique situation – different crimes, sentences, outdates, disciplinary histories, age, medical history, places of incarceration, proximity to infected inmates, availability of a home landing spot, likelihood of transmitting the virus to someone at home detention, likelihood of violation or recidivism, and danger to the community." *Id.* at *15. The district court ruled that this resulted in a lack of commonality because the only matter "apt to drive the resolution of the litigation" was which inmates should be released. *Id*. at *14 (quoting *Dukes*, 564 U.S. at 350.)

Here, the identical problem exists.  Petitioners' proposed class would combine inmates that have different crimes, sentences, outdates, disciplinary histories, ages, medical histories, proximities to infected inmates, availabilities of a home landing spot, likelihoods of transmitting

the virus to someone at home detention, likelihoods of violation or recidivism, and dangers to the community.  Moreover, class members likely have different means to provide for themselves upon release and different access to medical care upon release.  Petitioners even lump together inmates who are currently sick with COVID-19 with asymptomatic inmates and inmates who might have previously been sick and made a full recovery.  There simply is no commonality and typicality among proposed class member other than the fact or their incarceration at FMC Devens.

Further, Petitioners cannot show adequacy of representation. The "adequacy of representation element requires that [Petitioners] demonstrate that [their] interests will not conflict with those of the class members and that [their] counsel is qualified, experienced, and able to vigorously conduct the proposed litigation." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21 (D. Mass. 2003) (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Here, again, Petitioners fail. As set forth above, Petitioners do not have an identical interest, and in fact are ineligible for release, thus presenting conflicting interests.  Furthermore, Petitioners here demand a dramatic remedy that would have a profound effect on members of the class:  the immediate release and removal of a substantial portion of the population at FMC Devens. Even if Petitioners purport to have homes that they could go to upon release, they provide no assurances that other class members (including those that would have to be released to effectuate their requested injunction) are similarly situated.  Indeed, it is quite likely that the sudden removal of so many inmates would leave some of them homeless and without access to food, shelter, or medical care in the midst of a grave pandemic that is having a substantial impact on the nation.

Petitioners' failure to consider or account for such concerns in the immediate and sweeping relief that they seek demonstrates that they are not fit to represent the members of their proposed class.  Accordingly, this Court must deny class certification.

## **CONCLUSION**

The BOP is taking significant and ongoing steps to prevent the spread of COVID-19 in FMC Devens and to provide medical care and treatment for inmates who do become infected.  The BOP and FMC Devens have taken the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to staff members and the inmate population.  Shaw Decl. ¶ 66.  The various phases of BOP's Action Plan have been designed and implemented in a systemic manner both nationally and at FMC Devens in order to mitigate the spread of COVID-19.  *Id*.  The BOP and FMC Devens remain flexible in their ability to receive guidance from the CDC and other health organizations and to modify their actions to best respond to this pandemic, according to the quickly shifting needs on the ground.  Shaw Decl. ¶ 68.

For these reasons, and for those that may be argued orally, Petitioners cannot demonstrate that the BOP, or FMC Devens, has acted with deliberate indifference and their constitutional claims under the Eighth Amendment must fail.  Moreover, the release of hundreds of prisoners by this Court is neither permitted by law, nor would it serve the health and safety of the inmates or the general public.  Therefore, this Court must deny the Petition for Writ of Habeas Corpus, deny class certification in this case, and deny Petitioners' motions for a temporary restraining order, injunctive relief and declaratory judgment.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:    */s/ Eve A. Piemonte*
        Eve A. Piemonte
        Assistant United States Attorney
        United States Attorney's Office
        John J. Moakley U.S. Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA  02210
        (617) 748-3369
Dated: April 22, 2020    Eve.Piemonte@usdoj.gov