## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER GRINIS, MICHAEL GORDON, and ANGEL SOLIZ, on behalf of themselves and those similarly situated, *Petitioners*, <br><br> v. <br><br> STEPHEN SPAULDING, Warden of Federal Medical Center Devens, and MICHAEL CARVAJAL, Director of the Federal Bureau of Prisons, in their official capacities, *Respondents*. | No.  20-cv-10738-GAO <br><br> Leave to file excess pages granted on April 24, 2020 [D.E. 37] |

## PETITIONERS' REPLY TO RESPONDENTS' OMNIBUS RESPONSE

William W. Fick, BBO# 650562
Daniel N. Marx, BBO# 674523
Amy Barsky, BBO# 601111
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02210
857-321-8360
wfick@fickmarx.com
dmarx@fickmarx.com
abarsky@fickmarx.com

Matthew R. Segal, BBO# 654489
Jessie J. Rossman, BBO #670685
ACLU FOUNDATION
OF MASSACHUSETTS, INC.
211 Congress Street
Boston, MA  02110
(617) 482-3170
msegal@aclum.org
jrossman@aclum.org

## INTRODUCTION

Petitioners and other Class members remain in imminent danger of infection, illness, and death from COVID-19 despite the steps Respondents claim to have taken. That is because too many prisoners remain at FMC Devens. There is no question that a significant reduction of the population would greatly reduce the dangers to the prisoners who leave FMC Devens, the prisoners and staff who remain, and the surrounding community. Yet Respondents have made the deliberate and unconstitutional choice to keep almost all prisoners where they are—in a large, congregate setting that is extremely vulnerable to a rapid outbreak because social distancing, a "cornerstone" of prevention, is impossible. Although Respondents use words like "required criteria" and "ineligible" to describe their decision to bar so many people from being transferred to home confinement, they cannot defeat a claim of deliberate indifference by arguing they have tied their own hands with bureaucratic red tape. That is not a defense; it's a confession.

Since Petitioners filed this action on April 15, confirmed COVID-19 infections among BOP prisoners and staff have grown to 1,118 across 45 BOP facilities,[1] including the first confirmed infection at FMC Devens. Twenty-seven prisoners have died. During that same period, confirmed prisoner cases at FMC Forth Worth, an administrative security medical center like FMC Devens that holds many elderly and medically vulnerable men, exploded from 4 to 232 (three have already died).[2] Eight of the top ten COVID-19 clusters in the United States are now

---

[1] *See* https://www.bop.gov/cornavirus (last visited Apr. 26, 2020). As noted in the Petition, this total is artificially suppressed due to inadequate testing. *See also* Declaration of Prof. Lauren Brinkley-Rubinstein, (Apr. 26, 2020) ("Brinkley-Rubinstein Decl.") ¶¶ 9-11, 13, attached as Exhibit A. In addition, BOP apparently removes those who have "recovered" from its cumulative count of "open" cases.

[2] *See* Exhibit B (screenshots of FMC Devens weekly census data).

in prisons and jails.[3] Nursing homes—congregate facilities that share many features with FMC Devens—account for over 1,300 COVID-19 deaths in Massachusetts, more than half of the state total.[4]

Meanwhile, notwithstanding Respondents' assurances that they are expeditiously discharging their obligation to maximize transfers out of the facility, the population of FMC Devens has remained essentially static, near capacity in normal times.[5] That is deliberate indifference.

| Date | Camp | FMC |
|------|------|-----|
| April 9 | 108 | 914 |
| April 16 | 108 | 906 |
| April 23 | 106 | 905 |

In the face of rampant illness and numerous prisoner deaths in its facilities, Respondents have decided to carry out a policy that denies home confinement to prisoners – regardless of their vulnerability to COVID-19 – unless they meet numerous criteria.[6] Respondents have already used this policy as a basis to keep numerous prisoners inside FMC Devens, including Petitioner Gordon, who Respondents determined did "not qualify for priority consideration" because he has served 36.6% rather than 50% of his sentence.[7]

---

[3] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[4] Miriam Wasser & Bob Oakes, "COVID-19 Hits Elder Care Facilities in Mass. the Hardest, with More than 1,300 Now Dead," *WBUR* (Apr. 24, 2020), *available at* https://www.wbur.org/commonhealth/2020/04/24/seniors-coronavirus-nursing-homes-testing.

[5] *See* Ex. C (weekly data compiled from https://www.bop.gov/about/statistics/).

[6] *See* Respondents' Response to Petition for Writ of Habeas Corpus and Opposition to Petitioners' Motion for Immediate Bail and Injunctive and Declaratory Relief [D.E. 32] ("Resp.") at 18-20; *see also* Declaration of Amber Bourke [D.E. 32-2], ¶ 21 (April 22, 2020) ("Bourke Decl."); Declaration of Amber Bourke [D.E. 36-1], ¶¶ 18-19 (April 24, 2020) ("Bourke Supp. Decl.").

[7] *See* Bourke Supp. Decl. ¶ 28.

Even the eight prisoners reportedly approved for transfer to home confinement remain at FMC Devens, "quarantined" for 14 days[8] in punitive isolation that serves no public health purpose.[9] Although Respondents highlight a laundry list of "appropriate measures to protect" prisoners,[10] they concede that strict physical distancing, a necessary "cornerstone" of COVID-19 prevention, remains impossible at FMC Devens given the current population levels.[11]

"Courts cannot blithely defer to the supposed expertise of prison officials when it comes to the constitutional rights of inmates." *Wolff v. McDonnell*, 418 U.S. 539, 599 (1974). Respondents' arbitrary and convoluted compassionate release and home confinement screening policies are not an excuse but a deliberate and deadly bottleneck that risks the lives of prisoners, staff, and civilians alike. FMC Devens today remains filled with elderly men in their 70s and 80s, men with debilitating medical conditions, and men within months of completing their sentences, many of whom could be transferred to home confinement immediately with no danger

---

[8] *See* Resp. at 19.

[9] *See* Declaration of Professor Seth Prins, ¶¶ 5-18 ("Prins Decl."), attached as Exhibit D.

[10] *See* Resp. at 4-13, 30-34.

[11] Moreover, undersigned counsel have been unable to discuss the Respondents' filings with Petitioners. Counsel twice requested, on April 23 and 24, that Respondents facilitate legal phone calls with the named Petitioners in advance of today's hearing, but no such calls were accommodated. Counsel understand that, sometime last week, Gordon was transferred out of FMC Devens for emergency medical care related to his liver transplant and then returned to the facility on April 24. Counsel last heard from Grinis by Corrlinks e-mail on April 19, when he reported that prison staff commented, "no one is being released," removed a typewriter, and limited the amount of paper available to prisoners, with the effect of restricting their access to the courts. Then, on April 22, Respondents alleged that "Grinis is refusing to enter the required quarantine before his pending release to home confinement . . . result[ing] in a disciplinary action and the loss of his pending pre-release placement." Bourke Decl. ¶ 23, n.1. It is darkly ironic that, having apparently voiced genuine terror at the prospect of two weeks of solitary isolation in "quarantine," Grinis was sent to isolation anyway — as punishment — and now may remain at FMC Devens indefinitely, notwithstanding Respondents' earlier determination that he is "at high risk for COVID-19." *Id.*

to public safety. Contrary to Respondents assertions, this section 2241 habeas petition is a proper legal vehicle to bring the Petitioners' claims challenging unconstitutional confinement. Given the extraordinary circumstances of the COVID-19 pandemic, Petitioners readily satisfy the criteria for emergency injunctive release and class certification.

A substantial number of prisoners must be promptly evacuated from FMC Devens to save lives and mitigate the public health crisis that will otherwise decimate the Devens community. This Court should order Respondents to do so forthwith, as federal courts have done at other facilities. *See, e.g., Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674, at *25 (N.D. Ohio Apr. 22, 2020) (ordering transfers out of FCI Elkton "through any means"); *Roman v. Wolf*, No. 20-cv-0768-TJH (C.D. Cal. Apr. 23, 2020), D.E. 55 at 2 (ordering respondents to "immediately reduce the detainee population" at ICE detention facility "to such a level that would allow the remaining detainees to maintain a social distance of 6 feet from each other at all times and at all places"), *administrative stay granted* (9th Cir. Apr. 25, 2020) (No. 20-55436). Alternatively, this Court should exercise its inherent habeas authority to release a sufficient number of class members on bail, as another court in this District has done for dozens of ICE detainees in Bristol County. *See Savino v. Hodgson,* No. 20-cv-10644-WGY, 202 U.S. Dist. LEXIS 61775, at *28 (D. Mass. Apr. 8, 2020) ("[T]he Court follows the light of reason and the expert advice of the CDC in aiming to reduce the population in the detention facilities so that all those who remain (including staff) may be better protected").

## **ARGUMENT**

### I.    **This Court has authority to order the relief that Petitioners request.**

####    A.    **Section 2241 authorizes Petitioners' COVID-19-related claims.**

Respondents contend that "habeas relief is unavailable" because Petitioners challenge the "conditions of their confinement." Resp. at 21-22. Respondents are wrong for two reasons:

(1) Petitioners attack "the fact or duration" of their unconstitutional confinement, for which the only appropriate class-wide relief is the immediate, substantial reduction of the population, whether by compassionate release, home confinement, furlough, bail, or other means; and (2) there is no legal bar against habeas claims that challenge "the conditions" of confinement.

> **1.    Petitioners challenge "the fact or duration" of their confinement at FMC Devens, where social distancing is impossible.**

By characterizing the Petition as an ordinary "conditions of confinement" claim akin to a complaint about inadequate "medical care," Respondents misapprehend the issues. "Whereas many medical needs claims might appropriately be addressed through § 1983 litigation, claims concerning COVID-19 are not so easily classified." *Wilson*, 2020 U.S. Dist. LEXIS 70674, at *13; *see Money v. Pritzker*, Nos. 20-cv-2093 & 2094, 2020 U.S. Dist. LEXIS 63599, at *25-26 (N.D. Ill. Apr. 10, 2020) (recognizing "the unique context in which litigation over COVID-19 arises . . . because the sudden threat to mortality from the spread of virus in a congregate setting may affect the fact or duration of confinement").[12] In this case, Petitioners are not making traditional, individualized "quality of care" demands for orthopedic shoes, *see Warner v. Spaulding*, No. 18-cv-10850-DLC, 2018 U.S. Dist. LEXIS 70032 (D. Mass. Sept. 24, 2018), at *1-2; cataract surgery, *see Crooker v. Grondolsky*, No. 12-cv-12016, 2013 U.S. Dist. LEXIS 2071 (D. Mass. Jan. 4, 2013), at *1; Hepatitis C therapy, *see Kane v. Winn*, 319 F. Supp. 2d 162, 173-74 (D. Mass. 1998), or similar medical devices or services.

---

[12] In *Money*, the court relied on a declaration from Professor Judith Resnik, a habeas scholar who has opined that, given the "unprecedented circumstances, . . . 'COVID-19 claims ought to be cognizable under both provisions.'" 2020 U.S. Dist. LEXIS. 63599, at *25-26. Thus, the court ultimately reviewed the plaintiffs' claims under both § 1983 and § 2254; it dismissed the habeas claims because the plaintiffs, who were state prisoners, failed to exhaust available state remedies. *See id.* at *17, 46. That exhaustion issue is not present here. Prof. Resnik's declaration is separately attached hereto as Exhibit D.

Instead, Petitioners and the Class whom they seek to represent allege that their collective confinement at current population levels exposes them to deadly infection with a highly contagious virus in violation of the Eighth Amendment. They "ultimately seek to challenge the fact or duration of confinement," not simply "the dangerous conditions within the prison created by the virus." *Wilson*, 2020 U.S. Dist. LEXIS 70674, at *13. And for that reason, remedying the constitutional violations alleged in this case could not be accomplished simply by providing Petitioners and the putative Class members with more Virucide or with access alcohol-based sanitizers. The requested remedy, on a class basis, is necessarily the release or transfer of a sufficient number of class members from unconstitutional custody to allow for effective social distancing. *See id.* (recognizing that by prisoners at FCI Elkton brought habeas claims alleging that "continued imprisonment . . . is unconstitutional given the COVID-19 outbreak").[13]

Thus, the Petition properly pursues habeas relief. *See, e.g.*, *Francis v. Maloney,* 798 F.3d 33, 36 (1st Cir. 2015) ("[A]n individual may invoke § 2241 . . . to challenge placement (or lack thereof) in a community confinement center, or to contest one's imprisonment in a specific facility."); *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 (1st Cir. 2010) (explaining that when prisoner seeks "quantum change in the level of custody. . . then habeas corpus is his remedy"); *Brennan v. Cunningham*, 813 F.2d 1, 4-5 (1st Cir. 1987) (permitting habeas challenge to transfer from halfway house to state prison); *Putnam v. Winn*, 441 F. Supp. 2d 253, 256 (D. Mass. 2006) (finding habeas jurisdiction to consider challenge to rule prohibiting transfer to halfway house); *Fox v. Lappin*, 441 F. Supp. 2d 203, 206 (D. Mass. 2005) ("[W]here transfer or release are at issue, a habeas petition is warranted."); *Monahan v. Winn*, 276 F. Supp. 2d 196, 204 (D. Mass.

--------

[13] Many other courts have accepted habeas petitions as proper vehicles to address the COVID-19 pandemic in custodial settings. *See* Ex. F (compilation of cases).

2003) ("It is well-established that challenges to the 'manner, location, or conditions of a sentence's execution' are proper subjects of a habeas corpus action under § 2241.").

### 2.   Petitioners may also challenge "the conditions" of their confinement.

Although Petitioners have appropriately brought this case as a habeas action because they challenge the fact or duration of their confinement, they may also use habeas to challenge the unconstitutional conditions at FMC Devens. The First Circuit has expressly rejected the Respondents' argument that conditions habeas is unavailable to challenge conditions. *See Brennan*, 813 F.2d at 4 ("We reject this contention.").

In *Brennan*, the petitioner, serving a life sentence for murder, was transferred from the New Hampshire state prison to a halfway house to participate in a work-release program. After that assignment was terminated and the petitioner was sent back to state prison, he filed a § 2254 petition. The district court granted habeas relief. On appeal, the warden argued – like the Respondents here – the action could not be "maintain[ed] . . . under the federal habeas corpus statute," because "the claim for reinstatement" to the halfway house "challenge[d] the conditions of confinement and not the fact or length of confinement." *Id.* The warden further asserted – like Respondents – that "the proper vehicle for such a challenge" was § 1983. *Id.*

The First Circuit rejected that jurisdictional contention: "We do not agree that *Prieser* would mandate that the reinstatement claim be brought as a § 1983 action *even if we were to accept the [warden]'s characterization of the claim as a challenge to the conditions of confinement.*" *Id.* (emphasis added).

> In *Prieser*, the Court explicitly left open the possibility that a challenge to prison conditions, cognizable under § 1983, might also be brought as a habeas corpus claim.

*Id.* (citing *Dickerson v. Walsh*, 750 F.2d 150, 153-54 & n.5 (1st Cir. 1984) ("Federal prisoners have been permitted to contest the conditions of confinement by means of habeas proceedings

even though the conditions were not the cause of detention and even though release was not the appropriate remedy.") (collecting cases)); *see also United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available."); *Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1997) ("Section 2241 provides a remedy for a federal prisoner who contests the conditions of confinement.").

To understand how Respondents have misread the case law, it helps to revisit *Prieser,* on which Respondents mistakenly rely. Resp. at 21. *Prieser* involved a § 1983 action by state prisoners in New York who claimed that, as a result of disciplinary infractions, they had been wrongfully denied "good time" credit. 411 U.S. at 476. The procedural question whether "habeas corpus is the exclusive remedy in these circumstances" was, as the Supreme Court noted, of "considerable practical importance." *Id.* at 477. Proceeding under § 1983, rather than § 2254, allowed the plaintiffs to avoid the burdensome exhaustion requirements for habeas petitions; put another way, if the state prisoners had filed individual habeas petitions (or a single class petition), they could have not sought intervention by the federal court until they had first sought and been denied relief by the state court. *See id*. at 477, 488 (noting plaintiffs brought § 1983 claims "so as to avoid the necessity of first seeking relief in a state forum").

In resolving that procedural issue, the Supreme Court characterized claims that "attack[] the very duration of . . . physical confinement itself" as "within the core of habeas corpus." *Id.* at 487-88; *see id.* at 498 (holding "state prisoner's challenge to the fact or duration of his confinement . . . is just as close to the core of habeas as an attack on the prisoner's conviction"). Because the plaintiffs brought "core" claims, their "sole federal remedy" was § 2254, not § 1983. But in describing the "core" of habeas, the Supreme Court did not define its border. *See id.* at 499 (stating "we need not in this case explore the appropriate limits of habeas corpus as an

alternative remedy to a property action under § 1983"). It merely held "a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not the fact or length of his custody." *Id.* And the Court offered an important clarification: "*That is not to say that habeas corpus may not also be available to challenge such prison conditions.*" *Id.* (emphasis added).

"*Prieser* . . . in no way decided that habeas corpus would not lie to challenge conditions of confinement; it decided only that a state prisoner who was seeking to challenge the length of confinement could not utilize 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), to avoid the exhaustion requirements of § 2254(b) and (c)." *Kahane v. Carlson*, 527 F.2d 492, 498 (2d Cir. 1975) (Friendly, J., concurring). "The Court's central concern, in *Prieser* and its progeny, has been with how far the general remedy provided by § 1983 may go before it intrudes into the more specific realm of habeas, not the other way around." *Dockens v. Chase*, 393 F.3d 1024, 1028 (9th Cir. 2004). Thus, by insisting that "conditions" claims may *only* be brought in § 1983 actions, but not § 2241 petitions, Respondents attempt to constrain habeas corpus in a way that the Supreme Court and First Circuit have never endorsed.

Following *Prieser*, other federal appeals courts have agreed with the First Circuit that, although a § 1983 action can only challenge the "conditions" of confinement, but not the "fact or duration" of confinement, a habeas action can challenge either or both. *See, e.g.*, *Dockens*, 393 F.2d at 1027 (explaining "both the majority and dissent in *Prieser* suggested that there are some circumstances concerning prison conditions in which *both* habeas corpus and § 1983 suits may lie") (emphasis in original); *In re U.S. Parole Comm'n*, 793 F.2d 338, 344-45 (D.C. Cir. 1986) (holding "it [is not] necessary that litigation over the conditions of prison life proceed in habeas corpus" but can also establish § 1983 claims); *Boudin v. Thomas*, 732 F.2d 1107, 1111 (2d Cir.

9

1984) (holding "habeas might sometimes be available to challenge the *conditions* of confinement" and, thus, that petitioner's complaint seeking transfer from administrative segregation to general population could be brought as habeas petition) (emphasis in original); *Roba v. United States*, 604 F.2d 215, 219 (2d Cir. 1979) (holding "challenge to [petitioner's] transfer while seriously ill would be a challenge to the conditions of confinement, for which habeas corpus relief under § 2241 would be available").[14]

Closing the door completely to habeas claims concerning prison conditions that render confinement unlawful would not only run counter to Supreme Court and First Circuit precedent, it would also raise serious constitutional concerns about the Suspension Clause. *See* U.S. Const., Art. I, § 9, cl. 2; *Boumediene v. Bush*, 553 U.S. 723, 746 (2008) (opting "not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments that define the present scope of the writ"); *INS v. St. Cyr*, 533 U.S. 289, 305 &

---

[14] The overlap in remedies for unconstitutional prison conditions may explain why later cases, including decisions that the Respondents cite, Resp. 21-22, have consistently used qualified or hortatory language when distinguishing between habeas and § 1983 or *Bivens* claims. For example, in *Crooker*, this Court stated: "Claims for inadequate medical treatment are *most properly* characterized as conditions of confinement claims, which are *generally* not cognizable under § 2241; that *most* challenges to the constitutional adequacy of medical care *should* proceed as a civil rights action pursuant to *Bivens*." 2013 U.S. Dist. LEXIS 2071, at *5-6 (emphasis added); *see also Sperling v. Grondolsky*, No. 17-cr-12075, 2018 U.S. Dist. LEXIS 66936, at *3 (D. Mass. Apr. 20, 2018) ("*Typically*, a *Bivens* action is the appropriate means for a federal prisoner to challenge the adequacy of his medical treatment.") (emphasis added); *Sanchez v. Sabol*, 539 F. Supp. 2d 455, 459 n.1 (D. Mass. 2008) ("Notwithstanding the possible overlap of remedies, challenges to medical treatment remain *most squarely* in the realm of civil rights litigation under *Bivens* rather than habeas corpus.") (emphasis added); *Kane v. Winn*, 319 F. Supp. 2d. 162, 213-15 (D. Mass. 2004) ("For most conditions of confinement claims, . . . and particularly for those involving inadequate medical treatment, courts *usually* hold that habeas relief is not available.") (emphasis added). While it may be "generally," "typically," or "usually" true, it is not "necessarily" true. No Supreme Court or First Circuit case lays down such a rule. *See id.* Indeed, in "both state and federal prisoner cases, there are many indications that habeas will in fact lie for certain conditions of confinement claims." *Kane*, 319 F. Supp. 2d at 214.

n.13 (2001) (recognizing "the desirability of avoiding" have to "resolv[e] . . . a serious and difficult constitutional issue" about whether AEDPA and IIRIRA violate the Suspension Clause); *cf. Devitri v. Cronen*, 290 F. Supp. 3d 86, 93 (D. Mass. 2017) (finding jurisdiction under § 2241 and § 1331 in immigration proceedings, because otherwise, "the jurisdictional bar in 8 U.S.C. § 1252(g) . . . would violate the Suspension Clause as applied").

Finally, the COVID-19 pandemic constitutes "extreme circumstances" that justify exercising habeas jurisdiction over Petitioners' claims, even under the narrowest interpretation of habeas. *Crooker*, 2013 U.S. Dist. LEXIS 2071, at *9 (recognizing "extreme circumstances" may inform the "interpretation of the scope of § 2241"); *see Kane*, 319 F. Supp. 2d at 215 (holding habeas jurisdiction exists for "extreme cases" involving medical-treatment claims "where transfer or release might be a necessary remedy"); *see also Crooker v. Grondolsky*, No. 12-cv-12024-RGS, 2012 U.S. Dist. LEXIS 156760, at *4 n.2 (D. Mass. Nov. 1, 2012) (finding no habeas jurisdiction over "medical treatment" claim because the case presented "[n]o extreme circumstances"). This Court should not hesitate to act to prevent a public health catastrophe for the prisoners and staff at FMC Devens as well as the surrounding community.

### B.     The PLRA Does Not Bar Petitioners' Habeas Claims.

Respondents are incorrect that the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, "precludes the relief that Petitioners seek." Resp. at 22-26. As defined in the PLRA, "the term 'civil action with respect to prison conditions' . . . does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g)(2). Because Petitioners' COVID-19 claims are "properly before the Court as a habeas action," the PLRA "does not apply." *Wilson*, 2020 U.S. Dist. LEXIS 70674, at *24. Indeed, while "habeas proceedings are essentially civil actions, the Supreme Court has long recognized that the label is ill-fitting and that habeas is in fact a unique creature in the law." *Martin v. Bissonette*, 118 F.3d

871, 874 (1st Cir. 1997) (internal citations omitted). "All the circuits that have addressed this question have agreed that *the PLRA does not apply to habeas petitions*." *Id.* (adopting consensus; emphasis added); *see also Monahan*, 276 F. Supp. 2d at 204 (explaining "PLRA does not apply to section 2241 proceedings").[15]

Regardless, the PLRA's limitations on "release orders," § 3626(a)(3), on which Respondents rely, Resp. at 23-25, would not preclude the relief Petitioners request: ordering the BOP to exercise its existing authority to *recommend* compassionate release (which only underlying sentencing courts could grant), *transfer* inmates to home confinement (a form of BOP custody), or use other authority to reduce the facility's population (*e.g.*, furloughs). Alternatively, use of the Court's inherent habeas bail authority would constitute legal "enlargement" of class members' custody rather than the termination their sentences or "release." *Wilson*, 2020 U.S. Dist. LEXIS 70674, at *25 (explaining order to depopulate FCI Elkton "is not ordering the release of prisoners" because "inmates will remain in BOP custody, but the conditions of their confinement will be enlarged").

## II.   Failure to reduce substantially the FMC Devens population constitutes deliberate indifference to the known, deadly risk of COVID-19.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

---

[15] The COVID-19 cases on which Respondents rely, Resp. at 24, are inapposite. *See Money v. Pritzker*, Nos. 20-cv-2093 & 2094, 2020 U.S. Dist. LEXIS 63599 (N. D. Ill. Apr. 10, 2020), primarily asserted claims against state prison officials under § 1983 and the Americans with Disabilities Act. *See id.* at *7-8. Likewise, *Plata v. Newsom*, No. 01-cv-01351-JST, 2020 U.S. Dist. LEXIS 70271 (N.D. Cal. Apr. 17, 2020), involved decades-old civil rights (not habeas) litigation against state officials arising from chronic overcrowding and inadequate medical care. On the merits, unlike Respondents, the *Plata* defendants moved 1,300 prisoners "out of dormitory housing 'to available space in other prison[s] to create more space and allow greater physical distancing in the dorms.'" *Id.* at *14-15.

Respondents' submissions describe changes the BOP has made within FMC Devens in response to the deadly risk of COVID-19. Resp. 3-13; 26-34; Declaration of Dr. Megan Shaw [D.E. 32-1] (April 22, 2020), ¶¶ 7-65 ("Shaw Decl."). But even assuming these measures are actually being implemented consistently,[16] they still reflect a deliberate and therefore unconstitutional, choice not to take the more substantial steps that would be required to actually address the risk that Petitioners and the putative Class members face from COVID-19. That is because Respondents neither dispute that "[i]ndividuals must be able to practice physical social distancing for hygiene to have a meaningful impact" on the risk of infection, *see* Declaration of Dr. Joe Goldenson [D.E. 4-1] (April 14, 2020) ("Goldenson Decl.") ¶ 16, nor do they suggest that *any* of their changes enable such distancing within each housing unit of 150 people. Because strict social distancing, including within housing units, is the only effective means to prevent the spread of this fatal disease, this failure constitutes unconstitutional deliberate indifference.

> **A.** **Protective measures at FMC Devens are inadequate.**

"At this moment, a deadly virus is spreading amongst [FMC Devens] population and staff." *Wilson*, 2020 U.S. Dist. LEXIS 70674, at *20. As of April 26, there was at least one confirmed positive COVID-19 prisoner at FMC Devens.[17] Because FMC Devens is testing only symptomatic prisoners—not those who are pre-symptomatic or asymptomatic—this is likely

---

[16] Due to the obstacles in communication with prisoners at FMC Devens noted above, undersigned counsel are unable at this time to present additional sworn statements from class members. However, communications that counsel have received indicate that many of the measures described by Dr. Shaw are being implemented inconsistently, if at all.

[17] https://www.bop.gov/coronavirus/.

only "the tip of the iceberg." *See* Brinkley-Rubinstein Decl. ¶ 13.[18] Exposure to a fatal disease

that has caused international shuttering of non-essential businesses to avoid infection constitutes

an "unsafe, life-threatening condition" that endangers "reasonable safety." *Helling v. McKinney*,

509 U.S. 25, 33, 26 (1993); *cf. Wilson*, 2020 U.S. Dist. LEXIS 70674, at *19 (holding risk of

exposure to COVID-19 "obviously" satisfies the objective component of the Eight

Amendment).[19]

Critically, the measures detailed in Respondents' submissions – such as increased

education, distribution of PPE, and the provision of hygiene supplies – do not meaningfully

alleviate this substantial risk of harm at FMC Devens because these measures "are critically

deficient with respect to social distancing." Supplemental Declaration of Dr. Joe Goldenson

(April 26, 2020) ("Goldenson Supp. Decl.) ¶ 3 (Exhibit G); *see also id.* ¶ 2 (noting these changes

have "not meaningfully addressed the fundamental component of social distancing"). While it is

true that while COVID-19 "puts everyone at some degree of risk of getting sick," Resp. at 28,

not everyone is forced to live within less than six feet of more than 100 individuals. The changes

at FMC Devens have not altered that dangerous daily reality for its prisoners. Indeed, while Dr.

Shaw describes efforts to provide "separation *between* different units, she does not describe any

social distancing *within* each unit, which she herself describes as composed of approximately

---

[18] *See, e.g., id.* ¶ 12 (noting that when North Carolina's Neuse Correctional Institution tested all 700 prisoners within its facility, it was discovered that 65% of them had COVID-19, and 95% of those were infected were not experiencing symptoms at the time of the test).

[19] *See also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease"); *Powers v. Snyder*, 484 F.2d 929, 931 (7th Cir. 2007) ("[K]nowingly exposing a prisoner to hepatitis or other serious diseases could [] amount to cruel and unusual punishment in violation of the federal Constitution.");

150 prisoners." Goldenson Supp. Decl. ¶ 4. And within units, Respondents force Petitioners and other prisoners to engage in numerous activities, from lining up for meals to obtaining medications to using phones and computers, that involve clustering close together and being exposed to contaminated surfaces.

Respondents do not dispute that dozens of prisoners still "eat, sleep, recreate, shower, and use the bathroom under conditions where it is effectively impossible to follow the CDC's recommendation to maintain six feet of distance between themselves." *Id.* ¶ 5. The CDC recommends this social distancing not as an aspirational ideal, *cf.* Resp. at 30, but as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19" in carceral settings.[20] Consequently, "'[s]heltering in place' under these conditions cannot effectively mitigate the risk of COVID-19 transmission, particularly within the vulnerable population housed at FMC Devens." Goldenson Supp. Decl. ¶ 5.

Respondents' attempt to compare imprisonment at FMC Devens with life among "roommates or family members" is absurd. Resp. at 29. Many members of the community live with other people. But few, if any, live with 150 of them, in close quarters over which they have no meaningful control. What is more, FMC Devens is not a closed environment. Goldenson Supp. Decl. ¶ 8. Medical staff and correctional officers routinely enter and exit the facility. Due to pre-symptomatic and asymptomatic viral shedding, FMC Devens' practice of taking temperatures and screening for symptoms before entry (even assuming the practice is implemented correctly and consistently) does not remove the "daily risk that these officers will

---

[20] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

unknowingly bring the disease into the facility with them, where it could spread like wildfire among the vulnerable population that is unable to practice effective social distancing." *Id.* ¶¶ 8-9, 11; *see also* Brinkley-Rubinstein Decl. ¶ 15. As a result, even accounting for the measures described in Respondents' submissions, FMC Devens remains "at high risk of a COVID-19 outbreak at its current population levels." Goldenson Supp. Decl. ¶ 13.

> ### B. Failure to reduce the population constitutes deliberate indifference to the risk of infection with a deadly disease.

With respect to an infectious disease like COVID-19, deliberate indifference is satisfied when prison officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). Here, that life-threatening condition is the complete inability to practice social distancing at FMC Devens where such a practice is necessary to mitigate the risk of COVID-19 infection. Respondents' knowledge is apparent "from the very fact that the risk [is] obvious," while their actions and inactions reveal their unconstitutional "disregard." *Farmer*, 511 U.S. at 837. Specifically, Respondents' failure to make social distancing possible for the people in their custody is a deliberate choice, as they have declined to exercise powers at their disposal that actually *could* achieve this goal.

The BOP has several tools to reduce its incarcerated population, most directly through its authority to transfer prisoners to home confinement under 18 U.S.C. § 3624(c)(2) [hereinafter Section 3624]. Home confinement under Section 3624 requires approval of neither an Article III judge nor BOP Central, *compare with* 18 U.S.C. 4205(g) and 18 U.S.C § 3582(c)(1)(A), and can be accomplished directly by the Warden and the Regional Residential Reentry Manager. *Cf.* Bourke Supp. Decl. ¶ 26. Described by Respondents' own expert as BOP's "general authority"

to place prisoners in home confinement, Bourke Decl." ¶ 18, the Bureau's power under Section 3624 is typically constrained only by the statutory requirement that an individual must have 6 months or 10% of their sentence remaining. *See* 18 U.S.C. § 3624(c)(2). Yet even that limitation has now been removed. The "Coronavirus Aid, Relief, and Economic Security Act" (CARES) Act, Pub. L. 116-136, authorizes the Bureau to remove this eligibility requirement "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau," which Attorney General Barr did on April 3, 2020.[21] Eliminating this final statutory limitation on the BOP's authority, the Attorney General instructed the BOP "to immediately review all inmates who have COVID-19 risk factors" *including* those who were not previously eligible for transfer due to time restrictions.[22]

But the BOP forthrightly admits that it has chosen, during this pandemic, to implement a policy that excludes vast numbers of Class members as candidates for home confinement. While the Attorney General listed "discretionary factors" to be considered in assessing prisoners for release,[23] the Bureau is carrying out a policy that denies home confinement to prisoners who do not meet even one of ten "*required criteria*," such as "hav[ing] no incident reports in the past 12 months (regardless of severity level)" and "ha[ving] served 50% of their sentence." Resp. 18-19 (emphasis added). For example, the Bureau refused to transfer Petitioner Gordon to home confinement – and thus continues to subject him to the risk of catching and dying from COVID-

---

[21] Attorney General William Barr, Memorandum for Director of Bureau of Prisons [D.E. 4-6] (Apr. 3, 2020).

[22] *Id.*

[23] *Id.*

19 in prison – solely because he has served 36.6% rather than 50% of his sentence. Resp. 19-20; Bourke Suppl. Decl. ¶ 28.

Because of its deliberate choices, the Bureau has utterly failed to release people in any meaningful numbers. *See* Brinkley-Rubinstein Decl. ¶ 20. The 1,027 prisoners who have been transferred to home confinement since Attorney General Barr's April 3 directive encouraging the Bureau to use this authority represents just *half of one percent* of the people in BOP custody on April 1. *See* Brinkley-Rubinstein Decl. ¶ 20. The numbers at FMC-Devens are similarly paltry: out of 118 prisoners reviewed for home confinement, 91 (or 77%) were excluded as a matter of Bureau policy; eight (or 6.7%) were approved; and just two (or 1.7%) have transfer dates for this upcoming week. Bourke Suppl. Decl. ¶ 26. Even if the Bureau was unaware of the impact of its actions three weeks ago, it now must know that its self-imposed process is entirely incapable of achieving the necessary population reductions in time. Its continuation of the status quo in the face of such abject failure constitutes deliberate indifference. *Cf. Wilson*, 2020 U.S. Dist. LEXIS 70674, at *21 (finding deliberate indifference when defendant "has altogether failed to separate its inmates at least six feet apart").

Finally, Respondents compound their deliberate indifference by requiring the prisoners approved for transfers to first quarantine in solitary confinement for two weeks prior to transfer. *See* Bourke Decl. ¶ 22. This policy is unnecessary, as Attorney General Barr himself acknowledged the facility's discretion to allow prisoners to quarantine at home.[24] It is "ineffective as a health measure" to "constrain the spread of COVID-19 in a carceral setting. Prins Decl." ¶¶ 5, 10; *see also id.* at ¶ 5 (noting "I am unaware of any studies supporting solitary

---

[24] Attorney General William Barr, Memorandum for Director of Bureau of Prisons [D.E. 4-6] (Apr. 3, 2020).

confinement as a disease containment strategy in jails or prisons"). And it is inhumane. *See id.* ¶ 10. "Based on its severe psychological and physiological impacts"—which can manifest in as little as 10 days—"solitary confinement is frequently described as akin to torture." *Id.* ¶¶ 12, 13. After running the gauntlet of BOP's approval process, a prisoner "should not have to choose between continuing to face a heightened risk of COVID-19 infection within a prison, or experiencing the trauma of two-weeks solitary confinement before they can be released into the community." *Id.* ¶ 18. The imposition of this "illogical and self-defeating policy" which "appears to be inconsistent with the directive of the Attorney General, ungrounded in science, and a danger to both [prisoners] and the public health of the community," *United States v. Scparta*, No. 18-cr-578-AJN, 2020 U.S. Dis. LEXIS 68935, at *5-10(S.D.N.Y. Apr. 19, 2020), further violates the Eighth Amendment.

**III.    Petitioners are entitled to a TRO and/or preliminary injunction.**

**A.    Petitioners are likely to succeed on the merits.**

Petitioners have established a strong likelihood of success on the merits of their Eighth Amendment claims, as set forth in Section II above.

**B.    Petitioners will be irreparably harmed if this Court does not act.**

Respondents argue that the mere "possibility" of harm does not warrant relief. Resp. at 40. But in "this moment of worldwide peril from a highly contagious pathogen, the government cannot credibly argue that [prisoners] face not 'substantial risk' of harm (if not 'certainly impending') from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe." *Savino*, 2020 U.S. Dist. LEXIS 61775 at *13. Indeed, the "risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm." *Banks*, 2020 U.S. Dist. LEXIS 68766,

at *37; *see also Wilson,* 2020 U.S. Dist. LEXIS 70674, at *21 (finding irreparable harm based on risk of COVID-19).

Respondents argue that Petitioners cannot show that, if released, "they will be safer from the risk of infection or have access to adequate care if infected." Resp. at 41. But the baseline risk of infection in society at large, and deficiencies in the U.S. health care system, cannot justify subjecting Petitioners to extraordinarily high risk in a dense carceral setting where social distancing is impossible. "From both a practical and epidemiological standpoint, sheltering at home with a handful of people in a space without daily staff shift changes is qualitatively different from living in a congregant environment with 150 other people and staff that circulate between the facility and the community every single day."  Goldenson Supp. Decl. ¶12; *see also id.* ¶ 13 (noting that even accounting for "all of the measures articulate in Dr. Shaw's declaration . . . FMC Devens is at high risk of a COVID-19 outbreak at its current population levels"). Nor can the theoretical availability of individual applications for compassionate release or home confinement, Resp. at 41, remove the dangers to the Class, particularly where Respondents themselves, control important gateways to those mechanisms that they are failing to use. As the static tally of prisoners in the Medical Center and Camp attests, Respondents are not working to reduce the danger of COVID-19 at FMC Devens by reducing the population, notwithstanding Attorney General Barr's mandate to do so.

In this case, "[g]iven the gravity of [Petitioners'] asserted injury, as well as the permanence of death … [Petitioners] have satisfied the requirement of facing irreparable harm unless injunctive relief is granted." *Banks,* 2020 U.S. Dist. LEXIS 68766, at *39.

### C.      The balance of the equities and the public interest favor relief.

Respondents argue that "[t]he public would be placed at risk by release of criminally convicted inmates, without a release plan or conditions of release." Resp. at 42. They ignore that

Respondents, themselves could continue to exercise control over *how* to decrease population density — whom to release and under what conditions. *See Wilson*, 2020 U.S. Dist. LEXIS 70674, at *22-24 ("Petitioners do not ask this Court to throw open the gates to the prison and leave the inmates that are released to fend for themselves. Instead, Petitioners seek 'release' that consists of moving vulnerable inmates to various other types of confinement so that they are no longer at risk of dying from the virus"); *cf. Savino*, 2020 U.S. Dist. LEXIS 61775, at *23 ("The question is not so much whether any particular Detainee should be released …. Nor does it matter *how* the density of Detainees is [r]educed….").

The public safety risk of recidivism, Resp. at 42, is grossly overstated. Prisoners transferred to home confinement remain in BOP custody, subject to conditions and supervision. Every federal prisoner ultimately released from a custodial sentence also has a term of supervised release to follow, monitored by a local federal Probation Office. Moreover, the dangers posed by releasing elderly prisoners in their 70s and 80s, prisoners with debilitating medical conditions, and those who have no history of violence are negligible. And for prisoners set to finish their sentences in the next 18 months, whatever their offenses of conviction or prior histories, acceleration of that process could have little marginal effect on public safety.

Although some prisoners may lack a place to go, many others, such as Petitioners Grinis and Gordon, have families who could pick them up with an hour's notice (or with whom transportation arrangements could be made in a matter of days) and who could provide safe accommodations in private homes where prisoners could shelter-in-place and, if necessary, self-isolate. The inability of the Respondents to effectuate prompt community placements for those who need it is not excuse for continuing to perpetuate unconstitutional confinement.

Moreover, "granting injunctive relief which lessens the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public health." *Banks*, 2020 U.S. Dist. LEXIS 68766, at *39-40; *see also Wilson*, 2020 U.S. Dist. LEXIS 70674, at *22-24 ("there is a continued risk of harm to others, including prison staff, if inmates remain in the prison and the virus continues to thrive among the dense inmate population"). FMC Devens has outpatient care capacity only. *See* Shaw Decl. ¶ 2 (it provides "ambulatory care" and does "minor office-based procedures"). It has only 2 exam rooms and 6 physicians for nearly 1200 inmates, *id*. ¶¶ 2-3, the majority of whom will likely soon become infected. FMC Devens cannot actually *treat* COVID infections. All ill prisoners, therefore, will need to be transferred to local hospitals and will compete for limited healthcare resources in the surrounding community.

## IV.    The Court should certify the proposed Class and Subclasses.

Respondents' arguments against class certification, Resp. at 43-46, ignore that one court in this district and at least three other federal courts have already either certified, provisionally certified, or granted broad temporary relief applicable to a class of detained persons based on deliberate indifference claims concerning the threat of COVID-19. *See Savino*, 2020 U.S. Dist. LEXIS 61775, at *16-26 (certifying class of all ICE detainees at Bristol County jail, after provisionally certifying subclasses); *Wilson*, 2020 U.S. Dist. LEXIS 70674, at *15-19 & n.48 (conditionally certifying sub-class of inmates at FCI Elkton who are 65 years or older or have medical conditions, for purposes of preliminary injunction); *Banks*, 2020 U.S. Dist. LEXIS 68766, *13 (partially granting TRO to petitioners in D.C. correctional facilities without ruling on class certification but noting that named petitioners "have pled an injury which was caused by Defendants and is redressable by the relief requested" because "steps taken to reduce the risk of infection among any inmates… would also reduce the named Plaintiffs' risk"); *Roman*, No. 20-cv-00768-PVC (C. D. Cal. Apr. 23, 2020), D.E. 52 (provisionally certifying class of all detainees

at ICE detention facility). Respondents do not counter the analysis in any of these cases, much less attempt to justify the creation of an intra-district split of authority.

Respondents argue that because the proposed class-members have different vulnerabilities to COVID-19 and different characteristics that may bear on release, "[t]here simply is no commonality and typicality." Resp. at 44-45. But any such differences are immaterial for purposes of class certification. *See Savino*, 2020 U.S. Dist. LEXIS 61775, at *23 ("The case law supports a finding of commonality for class claims against dangerous detention conditions, even when some detainees are more at risk than others."); *Roman*, *supra*, D.E. 52 at 4 (explaining that differences among petitioners are "immaterial" and shared legal issues are sufficient even if remedies may vary); *Wilson,* 2020 U.S. Dist. LEXIS 70674, at *17 (noting that class-wide relief would still permit "individualized determination as to where each subclass member should be placed, because "Petitioners do not seek to open the prison gates to allow its inmates to run free," and the remedy "might look different for different inmates").

As the First Circuit has explained, "what really 'matters to class certification . . . is not the raising of common 'questions' as much as 'the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28 (1st Cir. 2019) (quoting *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011)) (emphasis and ellipsis in original). Accordingly, class certification is warranted when the unconstitutional harm is created by a common set of policies or practices, including prison polices and practice. *See id.* (citing *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014) (prison case)). The unconstitutionality here – Respondents' failure to ensure social distancing despite the known dangers of COVID-19 – "can be [resolved] in a single stroke." *Parsons*, 754 F.3d at 679. Decreasing population density to permit physical distancing

will resolve the unconstitutional harm *for the entire class*. To the extent the existing named petitioners could be somehow insufficiently "typical" of the class (an argument the Respondents have not explained or developed), additional petitioners could be joined or substituted – indeed, many Class members have already filed *pro se* requests to do just that.

Respondents also question adequacy of representation, arguing that Petitioners "do not have an identical interest[ ] and in fact are ineligible for release" and therefore their interests conflict with those of the class. Resp. at 45. Not so. The core claim of this case is that reducing density to permit social distancing mitigates the risk of infection and death for *all* class-members, those who are released *and* those who remain. *See Savino*, 2020 U.S. Dist. LEXIS 61775, at *25 (ruling class of all detainees at detention facility would be entitled to a "uniform remedy" – a reduction in population – even though some would be released or transferred from the facility and some would not).

## CONCLUSION

For the foregoing reasons, as well as those set forth in Petitioner's opening papers, the

Court should deny Respondents' request to dismiss the Petition, order emergency relief, and

certify the proposed class.

Respectfully submitted,

ALEXANDER GRINIS, MICHAEL GORDON, ANGEL SOLIZ,
and others similarly situated,

By their attorneys,

    /s/ William W. Fick

| | |
|---|---|
| William W. Fick, BBO# 650562 | Matthew R. Segal, BBO# 654489 |
| Daniel N. Marx, BBO# 674523 | Jessie Rossman, BBO# 670685 |
| Amy Barsky, BBO# 601111 | ACLU FOUNDATION |
| FICK & MARX LLP | OF MASSACHUSETTS, INC. |
| 24 Federal Street, 4th Floor | 211 Congress Street |
| Boston, MA  02210 | Boston, MA  02110 |
| 857-321-8360 | (617) 482-3170 |
| *wfick@fickmarx.com* | *msegal@aclum.org* |
| *dmarx@fickmarx.com* | *jrossman@aclum.org* |
| *abarsky@fickmarx.com* | |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on April 27, 2020.

                           */s/ William Fick*